State v. McO'Blenis.

THE STATE, Respondent, v. McO'BLENIS, Appellant.

1. A deposition of a witness taken upon the preliminary examination before a committing magistrate in the presence of the accused, may be received in evidence on the trial upon proof of the death of such witness. (RYLAND, Judge, dissenting.)

2. The provision of the constitution of this State declaring " that in all criminal prosecutions the accused has the right to meet the witnesses against him face to face" does not render such evidence illegal. (RYLAND, Judge, dissenting.)

*Appeal from St. Louis Circuit Court.*

Robert McO'Blenis was indicted at the April term of the St. Louis Criminal Court, in the yaar 1855, for the murder of Benjamin F. Brand. The indictment contained but one count, and that was for murder in the first degree. The cause was taken by change of venue to the St. Louis Circuit Court.

Upon the trial, the State offered to read in evidence the deposition of Louis Nievergelder, a witness sworn and examined on behalf of the State on the examination of the defendant before Mann Butler, the committing magistrate, on the charge of feloniously shooting and killing Benjamin F. Brand, being the same charge for which the defendant was afterwards indicted and was then being tried. The said Nievergelder had departed this life since his examination before the committing magistrate. It was admitted by the defendant that the witness testified before the magistrate on oath, in the presence of the defendant, and was cross-examined by the defendant; that his testimony was reduced to writing by the magistrate, and that the witness signed the same; that the paper offered was the testimony of the witness, so reduced to writing and signed by him and returned by the magistrate, taking the same and committing the defendant to jail without bail, duly certified and delivered to the jailor, accompanying the warrant of commitment; and that the witness was dead since his examination as aforesaid; and all preliminary proof was waived by the defendant, the only objection made by the defendant being as to the competency of said testimony, the witness being since deceased. But the defen-

dant objected to the reading of the paper, because it was not legal evidence against him under the constitution of this State. The court overruled the objection, and permitted the paper to be read in evidence. Exceptions were duly taken.

The jury rendered a verdict in the following form : " We of the jury find the defendant guilty of murder in the second degree, and assess punishment to imprisonment in penitentiary for ten years."

A motion for a new trial having been overruled, the defendant appealed.

*U. Wright,* (with whom were *E. Bates* and *Blennerhassett,*) for appellant.

I. The introduction of Nievergelder's deposition was a violation of the bill of rights of the people of Missouri in both the letter and the spirit of that instrument. In our declaration of rights it is said, " in all criminal prosecutions the accused has the right to meet the witnesses against him face to face." (Art. 13, sec. 9.) Now whatever these words may mean, it is at least certain that what they secure to the accused is beyond the control of any department of the government. The general assembly can not abrogate it by statute, nor can the courts judicially legislate it away. The thing secured is above all the " discretion" of courts, sound or unsound—above all " policy" of legislatures, wise or foolish. Whatever may be the right given by the words, it is a fixed right. It exists intact, or not at all. It can not be halved, quartered, or in less degree subdivided. It can not be made to yield to expediency or necessity. No court has power to say of it " we give the right in part ; what is withheld, is from necessity." Within the circle of expediency, policy and discretion, courts may hold such language ; but it is not constitutional language touching a constitutional right. What is the right secured by the words? I hold it to be nothing more, nothing less, nothing other, than the permanent establishment, by the fundamental law, of the *status* of every witness against the accused in a criminal prosecution.

It is a transparent mistake to confound this right with any
*rule of evidence.*  No rule of evidence is established by it, nor
is any such object aimed at.  The relative position of the " wit-
ness" and the accused is established, but what the witness may
lawfully swear from that position is *not* established.  That is
left to the courts, and is regulated by them under the system
known as the rules of evidence.  But whatever it may be lawful
for the " witness" to swear against the accused under those
rules, must be heard from his position fixed by the constitution.
If the witness be not in that position assigned him by the con-
stitution, he can not be heard at all.  Nor does this provision
of the bill of rights decide whether the " witness" shall be
sworn ; nor how he shall be examined or cross-examined ; nor
whether there shall be any cross-examination at all.  Such
questions must find their answers outside of the constitution,
or at least outside of this provision of it.

The " accused" shall *meet* the " witness face to face"—he
shall thus meet him in " all criminal prosecutions ;"—that is
the right.  A meeting might involve only presence, contiguity ;
but that is not enough.  It shall be a meeting in the mode and
fullness in which man must meet his God in the day of final
judgment, and that is " face to face."  The whole purpose of
the provision is to thwart falsehood.  If perjury were impossi-
ble, the provision would be without meaning.  Two objects were
secured by the words : first, the witness must look upon the
accused, the intended victim of a false oath, that he may see the
value of what he is about to destroy, and the accused shall look
upon the witness as he swears ; second, the triers shall look
upon the false witness and gather the perjury from his aspect.
The means are simple, but human experience has established
their efficacy as tests of truth.  They invoke only moral power,
but that after all is the highest power.  It is hard to say which
of the two instrumentalities is the greater.  " And the Lord
turned and *looked* upon Peter ;" " and Peter went out and wept
bitterly."  (Luke, chap. 22.)  When affidavits were read to
Mary of Scotland, in prison, imputing to her great crimes, the
unhappy queen said, " who are the witnesses ? [for their names

were not given ;] bring them before me, and they will forswear their falsehoods when they meet me face to face." The other instrumentality (the right of the triers to look upon the witness) is auxiliary to this. It brings knowledge of whatever is accomplished for innocence by the prior means home to the right quarter, and in the right way ; but its function does not stop there. It acts independently of the rules of evidence, by its own inherent power ; and sometimes renders a right derived from those rules unnecessary. Thus the inspection by the jury of a witness may dispense with a cross-examination ; but when this fails, it becomes auxiliary also to the rules of evidence, and gives to the right of cross-examination, derived from those rules (*not* from the constitution), a power which it could not have without it. It is thus sufficiently manifest that the *status* of the "witness," in a criminal prosecution, while it creates no rule of evidence, secures to every man accused of crime the largest amount of impunity from the operation of those rules which justice can allow.

When and where shall this meeting transpire ? Not in the secret chamber of the grand jury—not when complaint is made before a justice preliminary to a warrant ; but whenever and wherever a " criminal prosecution" has ceased to be a proceeding *ex parte*, and has taken the matured form of a *legal accusation of crime*, and the witness is brought to sustain it. In " all criminal prosecutions" the right shall obtain, says the bill of rights. These words embrace, I think, every form of " criminal prosecution" known to our laws. In prosecutions by presentment or indictment, the additional right of a speedy trial by a jury of the vicinage is given ; but I am not prepared to say that the right to meet the witness " face to face" is confined to that tribunal. Doubtless this security was *mainly* intended for the hour and place of actual peril, when liberty and life should be in greatest jeopardy, when the accused should stand before a tribunal having power over either or both ; but the words are broad enough to cover the initiate prosecution, whenever and wherever it takes the matured form of a legal accusation of crime. And the same words, as well as the rea-

sons on which they rest, carry the right through every stage of
the " criminal prosecution," so long as the " witness" can by
the mode of procedure be brought " against" the accused.
While the " witness" may swear, he shall swear " face to face"
with the accused.  The security lasts as long as the peril, and
the protection never ends until the peril is merged in judgment.

I deem it very fit to put a like question touching other and kin-
dred rights secured by the same pregnant section of the bill of
rights.  How often shall the accused have counsel ?  and where ?
If he once have counsel, is the constitution satisfied ?   If he
have counsel before the examining court, may counsel be denied
him before the jury ?   If once before a jury he have counsel,
may he be deprived of counsel on the second trial ?   How often
may the accused have the right of trial by jury ?   If *once* a
jury be empanelled in his case, is the constitutional guaranty at
an end ?   May he be denied that tribunal afterwards ?   If the
jury bring no verdict and are discharged, or if the verdict be set
aside, may that constitutional " *bulwark*" be from that time
abandoned as having done its office, and the State proceed to
judgment by a simpler and more summary process ?  How often
shall the accused have the right to compulsory process to force
the attendance of his witness ?   May the process be denied him
if once it has been invoked ?   These questions answer them-
selves.   No power in the government can rob him of counsel in
a " criminal prosecution" at any one of a hundred trials of the
same cause.   The jury must come a hundred times, if there be
as many trials ; and in all of them the compulsory process
must go for his witnesses; and at every trial the witnesses
against him must meet him " face to face," that he may look
for the hundredth time upon the witness while he swears, and
every jury may see the manner of the swearing.

It is said the accused once met the witness Nievergelder face
to face—met him in a " criminal prosecution"—met him before
justice Butler, and at that meeting *looked* upon the witness and
had there the right of cross examination.   That is true.   It
might also be truly said that justice Butler had the opportunity
of looking upon the witness, and of helping his judgment of

the credibility of the witness by an inspection of his manner. Now all that was, if not in obedience to the constitution, at least in harmony with it. The procedure was legal and appropriate; but if it was a "criminal prosecution" in the sense of the bill of rights, it did not end there. It was but preliminary to something that must follow; and, touching what was to come, the bill of rights speaks its solicitude, and not only re-asserts, but multiplies its precautions. Before justice Butler the accused was not *on trial*. That functionary had no power over life or limb—not even for a moment. He was armed with no authority to acquit or condemn. He took the initiative in accusation, but his action could neither bind the State nor the accused. He could discharge the prisoner, but could not free him from indictment. He might lawfully suggest that an indictment would be proper, but the grand jury could ignore the bill. His action was not even *necessary* to the indictment; it might lawfully precede, but could not control it. He was acting within the scope of legal inquiry for crime, and incidental to this right was a temporary power over the liberty of the accused, by warrant and mittimus, for that space of time which lies between the accusation and " the speedy trial by a jury of the vicinage." I have said the constitution gives the accused a right to meet the witnesses against him face to face before the examining magistrate, but I am not clear in this. The question depends upon what is meant by " criminal prosecution." Is the defendant before the justice " the accused?" or does he only become " the accused" when charged by presentment or indictment? It is not necessary to decide the question upon this record. The constitution either did or did not secure to the accused the right of meeting the witness Nievergelder face to face before justice Butler. If it did not, then the right obtains *only* before the traverse jury on indictment. If it *did*, who will, who can maintain that the same provision which secures this right to the accused in a place and at a time when he is not in peril, denies it to him in the place and hour of his utmost need?

I have said justice Butler could look upon the witness while he swore and be helped in judgment upon the credibility of the witness by the manner of his swearing ; but how could his convictions of the truth or falsity of the witness reach the *jury ?* There is no legal avenue open for the transmission of such convictions. They are reached only by sight, and they can be made only upon the mind that sees. But if there were no such difficulty, the moral and legal responsibility of each juror is his own. It could in nowise be governed by the convictions of the justice. The justice might credit the witness, while the juror would disbelieve him, or *vice versa.* Besides, the fact that the witness had sworn before the justice in a particular way might be, as it often is, the conclusive reason for unbelief of his testimony before the jury. Perjuries are oftener unmasked by the antagonism of the past and present swearings of the witness touching the same transaction than by any other single cause. Confronted with his contradictions he hesitates, stammers, chokes, and plunges by utterance into transparent falsehood, or proclaims the perjury in silence by the pantomime of the soul.

As to the right of cross-examination before the justice, the accused had it, but he did not get *that* from the constitution. He would have had it before the same justice, at the same time, if the suit had been on an account for twenty dollars, as he would have it in ejectment in other tribunals, or before arbitrators, or in the chamber of commerce, or in a church investigation, or before a committee of the General Assembly, or of the Congress of the United States. The right of cross-examination comes from the rules of evidence, a complex code enacted by expediency, policy, and necessity, and adapted by its flexibility to the exigencies of investigation. This code can not be found in the constitution of a state. I know of but one instance in our constitution in which a rule of evidence is established, and that is the provision touching prosecutions for libel,—" that the truth thereof may be given in evidence." But I have already shown that the largest exercise of the right of cross-ex-

amination before the justice could never fill the measure of the defendant's constitutional right before the jury of the vicinage. It could not bring the witness face to face—it could not inform the triers of his moral aspect while swearing—it could never abolish (for it is eternal) the distinction between a paper and a man. This right of cross-examination before a justice is in point of fact rarely exercised, and frequently for the obvious reason that the defendant is not prepared to exercise it. The proceeding is summary and hasty. When the prisoner is brought before the justice, he must " as soon as may be proceed to examine the complainant and the witnesses in support of the prosecution." The defendant, suddenly arrested and borne " forthwith" to the magistrate, meets for the first time the witnesses against him. He has had neither time nor opportunity to gather information of their character, their antecedents, or connection with the prosecution against him. The names of the witnesses are endorsed upon the indictment for the very purpose of enabling the accused to make such inquiries. And such knowledge is essential to the intelligent exercise of the right of cross-examination. Besides, he is not on trial, and should not be compelled to make defence; and cross-examination is defence. He may at his option, without the surrender of any the least of his legal rights, withhold all defence until he shall be brought on trial before his peers, who alone have power to decide his guilt or innocence. Every lawyer experienced in the defence of men accused of crime, knows the impolicy, as a general rule, of attempting before indictment the defence of the accused, whether he be innocent or guilty. If by the words " the accused has the right to meet the witnesses against him face to face" the framers of the constitution intended to give the right of cross-examination, they failed to accomplish their design. The words do not convey the right. They do provide for a meeting of the " witnesses" and the accused, but what shall be done when they meet is not provided. The manner of the meeting, face to face, and the place of meeting, establish a silent moral power in the accused and in the

jury over the witness—the power of the eye instructed by the moral sense; but the power to put questions must be derived from some other source. The words establish the presence of the witness near the accused, and presence would be a very great facility to the right of cross-examination (though it is not essential to it) if such right belongs to the accused. The words are apt words, and prove that those who used them felt the importance of phraseology. Why, if their only purpose was to secure the right of cross-examination, did they not use words fitted to convey that idea? Why not say, the accused in all criminal prosecutions shall have the right to cross-examine the witnesses against him? But if the words do give the right of cross-examination, that is not the only right they give, and therefore the words can never be satisfied by a cross-examination.

This provision in the bill of rights is not to be found in magna charta, and the decisions in England under it, as to examinations taken by virtue of the statutes of Philip and Mary, do not apply. Unfortunately they have been followed in some cases by judges of some of the states of our Union. But these decisions apply only to offences less than treason. The statute of Edward Sixth required (what magna charta did not), in a prosecution for treason, the production of the two witnesses in person at the trial, if living; and although, for one hundred years after the passage of this act, its provisions were shamefully violated in all prosecutions of the crown, within the last hundred years no deposition of a dead witness has been deemed competent by any English judge on a trial for high treason. (See Foster Crown Law, 234–5.) But the statute of Edward and magna charta stopped short of our declaration of rights. The latter provided for a conviction by " due course of law," and the former required the witnesses at the trial, *if living*, in treason only. The ninth section of our declaration of rights, in apter, clearer, stronger words, demands the witness at the trial in every grade and kind of criminal offence, and strikes out the words, " if living." It is said the object of the statute

of Edward was to cut off hearsay evidence, and that that is the object of the ninth section of our bill of rights. The answer is twofold—neither the statute of Edward nor the ninth section has any such effect, for hearsay evidence is competent now in a criminal prosecution just as in a civil case; and the object of both was to insure the presence of the witness at the trial by bringing him face to face with the accused. To demand his presence before the jury and the prisoner was said "to be hurtful to the crown," and the crown therefore brought affidavits, not men. (See generally The State v. Atkins, 1 Tenn. 229; Finn v. The Commonwealth, 5 Rand. 701; Roscoe C. L. 50; Foster C. L. 234, 237; 2 Russell on Crimes, 633, 893; 1 Hale P. C. 306; 2 Stark. Ev. 278-9; 13 Mo. 382; 6 Mo. 1.)

[It was further contended that the cases cited from sister states were either not in point — the constitutions of a large number of those states not containing any provisions guaranteeing to the accused the right to meet the witnesses against him face to face, or provisions entirely different from that contained in our declarations of rights — or that they proceeded upon grounds entirely untenable and inadmissible.]

*H. A. Clover*, (circuit attorney,) adduced the following authorities : 1 Ed. VI, c. 1½, § 22; 5 & 6 Ed. VI, c. 11, § 13; 1 & 2 Phil. & Mary, c. 13, 2 Stat. at large, p. 484; 2 & 3 Phil. & Mary, c. —, 2 Stat. at large, p. 493; R. C. 1845, Mo. p. 859, 860, 861; De Lolme on Eng. Const.; Rex v. Smith, 1 Holt, 614; 2 Starkie R. 208; Woodcock's case, 2 Leach, 565; Dingler's case, 2 Leach, 639; Rex v. Redbourne, 2 Leach C. L. 512; Rex v. Inhabitants of Eriswell, 2 Durnf. & East, 387, 707; Tharp v. The State, 15 Ala. 749; 17 Ala. 749; Davis v. The State, id. 354; Commonwealth v. Richards, 18 Pick. 436; The State v. Webb, 1 Hayw. 120; The State v. Moody, 2 Haw. 31; The State v. Hill, 2 Hill, S. C. 608; Bellinger v. The People, 8 Wend. 595; Bebee v. The People, 5 Hill, 33; The People v. Restell, 3 Hill, 294; The People v. Moore, 15 Wend. 421; The State v. Hooker, 17 Verm. 669; Dunn v. The State, 2 Ark. 249; 9 Western Law

Jour. 407 ; 8 id. 473 ; Johnston v. The State, 2 Yerg. 58 ;
Bostick v. The State, 3 Humph. 345 ; Kendrick v. The State,
10 Humph. 485 ; United States v. Wood, 3 Wash. C. C. 440 ;
Anthony v. The State, 1 Meigs, 265 ; Campbell v. The State,
11 Georg. 352 ; The State v. Tilghman, 11 Ired. 554 ; Collier
v. The State, 13 Ark. 676.

LEONARD, Judge, delivered the opinion of the court.

The main question that has been discussed before us in this
case is the competency of Nievergelder's deposition, which was
regularly taken before the committing magistrate upon the pre-
liminary examination in the presence of the accused, and read
on the trial upon proof of the deponent's death.  Before we
dispose of it, however, we will remark that on a careful exam-
ination of the record and consideration of other points present-
ed, we have not found any ground for reversing the judgment,
in the empanelling of the jury, in the admission or exclusion of
evidence, in the instructions under which the cause was tried, or
in the verdict, either as to form or substance, and, dismissing
with these remarks the minor points, we proceed at once to the
question that was mainly relied upon in argument before us.

The proud answer of the Roman governor to the Jews, when
they demanded of him the condemnation of Paul, was, " It is
not the manner of the Romans to deliver any man to die before
that he which is accused have the accusers *face to face*, and
have license to answer for himself concerning the crime laid
against him."  And De Lolme, a foreigner, born in Switzer-
land, and educated under the civil law, impressed by the strong
contrast in this respect between the mode of administering
criminal justice in England and throughout the continent of
Europe, (2 De Lolme, by Stephens, book 1, chap. 12 & 13,)
says : " When at length the jury is formed, and they have taken
their oath, the indictment is opened, and the prosecutor pro-
duces the proofs of his accusation ; *but, unlike the rules of the
civil law, the witnesses deliver their evidence in the presence*

*of the prisoner.*"  And again : " It is an invariable rule that
the trial be public ; the prisoner neither makes his appearance
nor pleads but in places where every body may have free en-
trance ; and the witnesses, when they give their evidence—the
judge, when he delivers his opinion—the jury, when they give
their verdict, are all under the public eye."  In a note, we are
informed of the *secrecy* with which the proceedings in the ad-
ministration of criminal justice are carried on according to the
*rules of the civil law, which, in that respect are adopted all
over Europe.*  " As soon as the prisoner is committed, he is
debarred of the sight of every body till he has gone through his
several examinations.  One or two judges are appointed to ex-
amine him, with a clerk to take his answers in writing, and he
stands alone before them in some private room in the prison.
The witnesses are to be examined apart, and *he is not admit-
ted to see them till their evidence is closed ;* they are then *con-
fronted* together before all the judges, to the end that the wit-
nesses may see if the prisoner is really the man they meant in
delivering their respective evidences, and that the prisoner may
object to such of them as he shall think proper.  This done,
the depositions of those witnesses who are adjudged upon the
trial to be exceptionable are set aside.  The depositions of the
others are to be laid before the judges, as well as the answers
of the prisoner, who has been previously called upon to confirm
or deny them in their presence : and a copy of the whole is de-
livered to him that he may prepare for his justification.  *The
judges are to decide both upon the matter of law and the
matter of fact,* as well as upon all incidents that may arise
during the course of the trial, such as admitting witnesses to be
heard in behalf of the prisoner," &c.

This contrast between the common law and civil law mode of
administering criminal justice, which prevailed over the whole
continent ever since the latter age of the Roman law, impressed
itself strongly upon the mind of the intelligent foreigner, and
is forcibly presented in his book ; and these great principles of
the common law to which he has referred—the accusation by a

27—VOL. XXIV.

grand jury—the public trial by a petit jury of the neighbor-
hood, instead of by a permanent body of men—the production
of the witnesses before the court, and their public examination
there in the presence of the accused—the right of the accused
to compel the attendance of his own witnesses to be heard in
his own defence—and his exemption from torture, or being
otherwise required to testify against himself—have been deemed
of so much importance on this side of the Atlantic, that they
have been generally, in some shape or other, incorporated into
most of the American constitutions, and in this way secured
against legislative control. Our own bill of rights secures to
the accused, among other things, the right "to be heard by
himself and his counsel;" "to demand the nature and cause of
accusation;" "to have compulsory process to compel the at-
tendance of witnesses in his favor;" "*to meet the witnesses
against him face to face;*" and "to a speedy trial by an im-
partial jury of the vicinage," and to an exemption from "being
compelled to give evidence against himself;" and the admis-
sion upon the present trial of Nievergelder's deposition is sup-
posed to have violated the clause which secures to the accused
"in all criminal prosecutions the right to meet witnesses against
him face to face." The great security of the accused how-
ever, after all, is in the fundamental principle of the common
law, that *legal evidence consists in facts testified to by some
person who has personal knowledge of them; thus excluding
all suspicions, public rumors, second-hand statements, and
generally all mere hearsay testimony; whether oral or writ-
ten, from the consideration of the jury*—the usual test of
this hearsay evidence being that it does not derive its value
solely from the credit to be given to the witness who is be-
fore them, but partly from the veracity of some other individual.
This great principle however, like all others, has its exceptions
and limitations, which are as well settled as the rule itself, and
among these exceptions, *in its* application to the administration
of criminal justice, are, dying declarations in reference to the
same homicide, and the deposition of a witness regularly taken

State v. McO'Blenis.

in a judicial proceeding against the accused in respect to the same transaction and in his presence, when the subsequent death of the witness has rendered his production in court impossible; and the question now to be passed upon comes to this : whether the provision in our constitution is to be construed so as to abolish both or either of these exceptions, so that hereafter this species of evidence, which has heretofore, it is believed, always been received both in England and all over the United States, must be excluded. The constitution, it is to be observed, has not undertaken to define, by any *direct provision*, what constitutes competent evidence in criminal cases, except in the single case of treason, but requires it to come from witnesses standing in the presence of the accused, and it may be in the tribunal where his guilt or innocence is to be finally passed upon. If the clause be understood literally, it provides for the production of the witness, but does not prescribe what he may communicate as evidence. It compels his presence in court, but leaves the evidence he may give to be regulated by law. The dying statement of the slain, and the deposition of the deceased witness, are both mere hearsay in the legal sense of the term. The truth of the facts they relate do not depend upon the veracity of the witness who heard the oral statement in one case, or of the officer who heard the testimony of the deponent and wrote it down and read it over to him in the other, but mainly upon the credit due to *statements made under such circumstances.* Even in the civil law mode of procedure the witnesses, it seems, are ultimately *confronted* with the accused, and therefore it may be said literally even there that they " meet the accused face to face." But all such constructions would be quite too narrow, and altogether unworthy both of the instrument and of this tribunal. The people have incorporated into their frame of government a great living principle of the common law under which they and their ancestors have lived, and it is the duty of the court so to construe it as to make it effectual to answer the great purpose they had in view. And this principle, we think, is no other than the prin-

ciple of the common law in reference to criminal evidence, *that it consists in facts within the personal knowledge of the witness, to be testified to in open court in the presence of the accused.* This principle, however, was nowhere written down on parchment. It is not to be found in magna charta, or in the English bill of rights, but it existed in the living memory of men, and was always a part of the common law, although in bad times it was trodden under foot by bad men in high places. It is not, however, a *stiff, unbending rule*, extending to every case, without exception, falling within its letter, but is limited and controlled by subordinate rules, which render it safe and useful in the administration of public justice, and are as well established as the great principle itself, which, with all its exceptions and limitations, was taken from the existing law of the land and incorporated into the constitution. The purpose of the people was not, we think, to introduce any new principle into the law of criminal procedure, but to secure those that already existed as part of the law of the land from future change by elevating them into constitutional law. It may as well be the boast of an Englishman living under the common law, as of a citizen of this state living under our constitution, that in a criminal prosecution he has a right to meet the witnesses against him face to face ; and yet it was never supposed in England, at any time, that this privilege was violated by the admission of a dying declaration, or of the deposition of a deceased witness, under proper circumstances ; nor, indeed, by the reception of any other hearsay evidence established and recognized by law as an exception to the general rule. It is said by Lord Aukland, in reference to the conduct of the British courts in the sixteenth and part of the seventeenth centuries— " Depositions of witnesses forthcoming, if called, but not permitted to be confronted with the prisoner—written examinations of accomplices living and amenable—confessions of convicts lately hanged for the same offence—hearsay of these convicts repeated at second-hand from others—all formed so many classes of competent evidence, and were received as such in the

State v. McO'Blenis.

most solemn trials by learned judges." · (Principles of Penal Law, 2d ed. 197) But no complaint of the character of the one now made was ever heard. This was not an evil to be provided for by any law, much less by a constitutional provision; these exceptions to the general rule were never considered violations of the rule itself; they grew out of the necessity of the case, and are founded in practical wisdom. The facts thus communicated go to the jury, not as entitled to the full faith of the facts sworn to by a witness from his own personal knowledge, but yet as competent to be considered by the jury in forming their verdict. But whether these exceptions be wise or unwise, is not submitted to our judgment. They were well established at the time, and, we think, went into the constitution as part of the great principle of criminal evidence adopted by the clause now under consideration.

We refer, in conclusion, in confirmation of our views upon the subject, to the decisions of the other states; but as they are cited in the briefs, we shall do so in a general manner, without calling attention to the particular cases. The privilege now under consideration exists in every state where the common law prevails, either as part of that law, or by a constitutional provision similar to our own, and yet evidence of this character, it appears, has never been excluded but in a single case, decided in early times in Tennessee, and which has since been expressly overruled. In some of the states it has been expressly recognized as competent by direct decisions to that effect, and in all of them the uniform current of judicial dicta, whenever the question has been a subject of discussion, is in favor of its competency. We are constrained, therefore, both on the score of reason and authority, to pronounce in favor of the legality of the evidence. The judgment must therefore be affirmed; Judge Scott concurring.

RYLAND, Judge, dissenting. I regret that I have been unable to concur in the opinion of the court delivered in this case. I consider that the court below committed error in allowing the

examination of Nievergelder, taken by the committing magistrate, to be read as evidence to the jury. By the second section of article 2 of the act regulating proceedings in criminal cases (R. C. 1845, p. 857,) it is provided, "whenever complaint shall be made to any such magistrate that a criminal offence has been committed, it shall be his duty to examine the complainant and any witnesses who may be produced by him on oath." The 3d section requires the magistrate, if it appear that any criminal offence has been committed, to issue his warrant to have the offender arrested and brought before him. Section 13 makes it the duty of the magistrate, when the offender has been arrested and brought before him, to proceed as soon as may be to examine the complainant and witnesses produced in support of the prosecution on oath, in the presence of the prisoner, in regard to the offence charged, and other matters connected with such charge which said magistrate may deem pertinent. The prisoner in this case was before Mann Butler, Esq., a justice of the peace for St. Louis county, one of the magistrates or officers contemplated by the said statute, undergoing an examination upon a charge of felonious homicide, the same offence for which he was convicted in this case. It was on the examination before justice Butler that the testimony of Nievergelder was taken and reduced to writing by the justice and signed by the witness in accordance with the requisitions of the statute. The prisoner was present at the examination of the witnesses, and had his counsel there, who cross-examined. Afterwards the prisoner was indicted and put upon his trial for the same homicide. It was under these circumstances that the written testimony of the witness Nievergelder, who died before the trial, was offered in evidence against the prisoner, and admitted by the court against the objection of the prisoner's counsel. The point made by the counsel of the prisoner in this matter of Nievergelder's testimony, is, that its admission by the court on the trial of the cause was a direct violation of the constitution of Missouri. The 9th section of the 13th article of the constitution of this state is in these words: "That in all criminal

prosecutions the accused has the right to be heard by himself and his counsel ; to demand the nature and cause of accusation ; to have compulsory process for witnesses in his favor ; to meet the witnesses against him face to face ; and, in prosecutions on presentment or indictment, to a speedy trial by an impartial jury of the vicinage ; that the accused can not be compelled to give evidence against himself, nor be deprived of his life, lib erty, or property, but by the judgment of his peers or the law of the land."

What is the meaning of the words " to meet the witnesses against him face to face ?" This is the question, and the only question, upon which the admissibility of the evidence depends. Unless it can be shown that the words have some occult or arti ficial meaning, they must be understood literally ; they must be taken in their ordinary or common acceptation. This would require the prisoner and the witness to stand before each other, to be in the presence of each other. The language contem plates that the face of the prisoner shall oppose the face of the witness ; they shall be confronted. In fact it is admitted that such is the meaning of the words. But while this is admitted, it has been contended that the prisoner and the witness Niever gelder were thus brought face to face before justice Butler, and that the demands of the constitution have been fully satisfied by that meeting. I do not view it in this light. The words are, " In all criminal prosecutions the accused has the right to meet the witnesses against him face to face." Now if the words in question do require, as no one has yet denied, that the witness and the prisoner shall confront each other, and if that was ne cessary to the constitutional validity of the testimony taken be fore the justice, it could not be dispensed with on the trial before the traverse jury, unless it could be shown that there was no criminal prosecution going on there. It seems to me there is nothing in this phraseology which confines the right of the prisoner to any one particular prosecution. The meaning, on the contrary, appears to be, that whenever there is a prosecution and a witness there the right of the prisoner to meet the wit-

ness *face to face* is given by the constitution. This view of the subject derives additional force from considering the other rights which are guaranteed the accused by the same section of the constitution. " In all criminal prosecutions the accused has the right to be heard by himself and counsel ; to demand the nature and cause of accusation ; to have compulsory process for witnesses in his favor ; and, in prosecutions or presentment or indictment, to a speedy trial by an impartial jury of the vicinage." Now with which one of these important rights guaranteed to an accused party would it be proper to dispense because it had been once enjoyed ? If a person had been arrested and taken before a magistrate on charge of crime, and committed for trial before a petit jury, ought process for witnesses preparatory to his trial to be denied him because he had been allowed process in the examining court ? If a prisoner has had one speedy trial of his cause, may he for that reason be detained afterwards without a hearing at the pleasure of the State ? Or is he to have counsel but once ? *Noscitur a sociis* is a sound maxim of the law, and if applied to the construction of the clause in question will seem to show that the framers of our constitution intended to give it scope and purpose as large as that of any of its companions.

Passing by what seems to me to be the plain and obvious import of the language of the constitution, I can conceive of no possible reason why the draftsmen should not intend what their words would indicate. Is there any reason making it important that the witness and the accused should meet face to face at the examination before the magistrate, which would not apply with greater force on the trial before the petit jury ? I can think of none. It has been urged at the bar that the provision in question was intended merely to secure the right of cross-examination. To this it has been replied that for such a purpose the language is most unfortunate. But concede for a moment that it was so intended, and that it secures nothing more than the right to cross-examine. Certainly that is a right which may be enjoyed more than once—is not less valuable on the trial before

the petit jury, and can not be exercised at all unless the witness is present in court. I have no doubt at all that the right of cross-examination was intended to be secured to the accused, not once only, but on every occasion of a prosecution against him—*in all prosecutions*. But this is not all that was intended to be secured. The right of cross-examination might be exercised without the personal presence of the witness *face to face* on the trial before the prisoner and the triers. It is so exercised in civil cases. But I am of opinion that the words, "*face to face*," in the constitution, were designed to secure to the accused something more than the right of cross-examination *as it is enjoyed in civil cases*. No such language, so far as I am advised, has ever been employed in regard to the examination of a witness in any civil case. These words must then have some additional meaning, and give some different manner of proceeding to the criminal prosecution. There is in the nature of things good and sufficient reason for the difference. Every one must know there is a difference in the effect of the same words when delivered in open court from the mouth of the witness and when read from a deposition. They may seem worthy of credit in the one case, and positively unworthy of all credit in the other. Who can be unmindful of the influence of the manner and carriage of a witness on the stand? There are many things aside from the literal import of the words uttered by the witness while testifying on which the value of his evidence depends. These it is impossible to transfer to paper. Taken in the aggregate, they constitute a vast moral power in eliciting the truth, all of which is lost when the examination is had out of court and the mere words of the witness are reproduced in the form of a deposition. This moral power which, I repeat, is a vast one in the hands of the prisoner and the triers, is intended to be grasped and wielded by this constitutional requirement of "*face to face*." A remarkable instance of its force was cited by the prisoner's counsel on the argument, which may well be mentioned: " And Peter said, ' Man, I know not what thou sayest :' and immediately, while he

yet spake, the cock crew. And the Lord turned and *looked* upon Peter, and Peter remembered the word of the Lord, how he had said unto him, 'Before the cock crow thou shalt deny me thrice.' And Peter went out and wept bitterly." (St. Luke's Gospel, ch. xxii : 60, 61, 62.) No pen can put on paper words indicative of the power of that look ; nothing was said ; the Lord turned and looked upon Peter, and the heart of the sturdy, self-confident disciple became liquified at that look, and he "wept bitterly." Certain Jews made accusation against St. Paul before the Roman governor, Festus, and demanded judgment against him. Festus says to them : "It is not the manner of the Romans to deliver any man to die, before that he which is accused have the accusers *face to face*, and have license to answer for himself concerning the crime laid against him. Therefore when they were come hither, without delay on the morrow I sat on the judgment-seat, and commanded the man to be brought forth. Against whom, when the accusers stood up, they brought none accusation of such things as I supposed." (Acts, chap. xxv : 16, 17, 18.) Here the presence of the prisoner in the proud Roman court had the moral force of changing the accusation of his persecutors, who, in his absence, had demanded judgment of death against him ; but when compelled to meet and accuse him face to face, "brought none accusation of such things" as they had before induced the governor to suppose they would.

It ought to be frankly admitted that the history of criminal prosecutions in England from 1553, when Mary ascended the throne, down to the abdication of James II, in 1680, furnishes cause enough for the introduction of some stringent rule whereby to test the truth of the statements of prosecuting witnesses. Mr. Hallam says (Constitutional History, p. 138,) "I have found it impossible not to anticipate in more places than one some of those gloomy transgressions of natural as well as positive law, that rendered our courts of justice, in cases of treason, little better than the caverns of murderers. Whoever was arraigned at their bar was almost certain to meet a virulent pro-

secutor, a judge hardly distinguishable from the prosecutor except from his ermine, and a passive pusillanimous jury. Those who are acquainted with our modern, decent and dignified procedure can form little conception of the irregularity of ancient trials ; the perpetual interrogation of the prisoner which gives most of us so much offence in the tribunals of a neighboring kingdom ; and *the want of all evidence except written, perhaps unattested, examinations or confessions.*" On the trial of Mary, Queen of Scots, the material witnesses were not examined in open court. (Hallam Const. His. 90.) Of this trial Dr. Robertson (History of Scotland, p. 266,) remarks : " If the testimony of Babington and his associates was so explicit, why did not Elizabeth spare them for a few weeks and by confronting them with Mary overwhelm her with the full conviction of her crimes ? Naué and Curle were both alive ; wherefore did they not appear at Fotheringay ? For what reason were they produced in the Star Chamber, where Mary was not present to hear what they deposed ?" · " It is no easy matter to determine whether the injustice of appointing this trial, or the irregularity of conducting it, was greatest or most flagrant.".

Sir Michael Foster, in his Crown Law, p. 234, says : " I do not find in looking over the State trials that in crown prosecutions any great regard was paid to the acts of Edward VI for near a century after they passed, or indeed to the common well known rules of legal evidence, though the authors who wrote in those days do sometimes speak of the acts as then in force. In the case of William Thomas, when they were undoubtedly in force, they were rendered quite nugatory by this very extraordinary resolution, that one witness of his own knowledge, and another by hearsay from him, though at third or fourth hand, made two witnesses or accusers within the acts. And in the case of Sir Nicholas Throckmorton, which came to trial the same term, *no sort of regard was paid to them ;* for, though the prisoner insisted on the benefit of them, particularly that which requires two witnesses to be brought *face to face* upon the trial, *the counsel for the Crown went on in*

*the method formerly practiced, reading examinations and confessions of persons supposed to be accomplices, some living and amenable, and others lately hanged for the same treason.* In many of the succeeding trials, the prisoners were told the statutes of Edward VI were repealed, *particularly that which required two witnesses to face the accused; that this law had been found dangerous to the Crown;* that witnesses may be *prevailed on to unsay in court what they have said upon their examinations; that the confessions of persons accusing themselves are the strongest of all evidence against their accomplices.*" This every man, (says Foster,) who will do so much penance as to read over the State trials during the reigns of Elizabeth and James, will find to have been the *doctrine and practice of the times.* Now what higher tribute could be paid to the moral effect of the witness and the accused meeting on the trial face to face, than to say that such a meeting has been shown by experience to be dangerous to the success of prosecutions; that it has the power to make the witnesses, when they come into court, unsay what they had previously said out of court? How is it possible to say, with these facts before us, there was no occasion for the provision which has been inserted in our constitution? Or how is it possible to doubt what was intended to be secured by its insertion?

I will notice a few cases taken from the history of former times, which were known to the framers of our constitution, and which, no doubt, had their influence in inserting this provision in our "bill of rights." In 1589, Philip Howard, Earl of Arundel, was tried for high treason. Gerard and Shelly were witnesses against him. These witnesses accused him of having offered up his prayers for the success of the Spanish expedition against England. Arundel declared that his prayers were only for the preservation of himself and fellow-catholics from the general massacre to which report had said they were doomed in the event of the Spaniards effecting a landing; then fixing his eyes upon Gerard, and adjuring him "to speak nothing but the truth, as he must one day appear before the tribunal of the liv-

ing God to answer for what he should then say," he so daunt-
ed and disconcerted the witness that he lost his utterance and
was unable to repeat his first assertions. (Strickland's Lives
of the Queens of England, vol. 7, p. 103.) Will any one pre-
tend to deny that this right to meet the witnesses face to face
in all prosecutions for crime is not a tower of strength to the
accused? Its power was known and felt to that people from
whom we have derived many of our notions of government and
the great principles of law.

"No freeman shall be taken or imprisoned, or be disseized
of his freehold or liberties, or free customs, or be outlawed, or
exiled, or any otherwise destroyed; nor will we pass upon him,
nor condemn him, but by lawful judgment of his peers, or by
the law of the land. We will sell to no man, we will not deny
or defer to any man, either justice or right." (Magna Charta,
chap. 29.) Of this charter Lord Coke says: "It is but de-
claratory of the old law." *Per legale judicium parium suo-
rum, vel per legem terræ.* Lord Coke, commenting on the
words *per legale judicium*, says: "By the word *legale*,
amongst others, three things are implied: 1. That this manner
of trial was by law before this statute. 2. That their verdict
must be legally given, wherein principally it is to be observed,
1st, That the lords ought to hear no evidence but in the pre-
sence and hearing of the prisoner; 2ndly, After the lords be
gone together to consider of the evidence, they can not send to
the high steward to ask the judges any question of law but in
the hearing of the prisoner, that he may hear whether the case
be rightly put, for, *de facto jus oritur;* neither can the lords,
when they are gone together, send for one of the judges to
know any opinion of law; but the high steward ought to de-
mand it in court in the hearing of the prisoner. 3. When all
the evidence is given by the king's learned counsel, the high
steward can not collect the evidence against the prisoner, or in
any sort confer with the lords touching their evidence in the ab-
sence of the prisoner; but he ought to be called to it; and all
that is implied in this word *legale.*" (Lord Coke's Second

Inst. 48, 49.) Thus we see that Lord Coke's notion of the expression, " but by the *lawful* judgment of his peers," was what the old law required before the statute known as Magna Charta, 9th Henry III, and that no evidence ought to be heard but in the presence of the prisoner. This was Coke's understanding of the law, and of this phrase *per legale judicium*. The framers of our constitution well knew this ; they were familiar with the English magna charta. They also well knew how often it had been totally denied to prisoners of the English courts to have the witnesses brought into court to meet them face to face. They knew that the statute of Edward VI had been totally disregarded in trials of treason, and to avoid these acts, and to withdraw our state prosecutions from the influence of such authorities as the English courts might present, and to place it beyond doubt, they declared and inserted it in the declaration of rights, " that in all criminal prosecutions the accused has the right to be heard by himself and his counsel ; to demand the nature and cause of the accusation ; to have compulsory process for witnesses in his favor ; to meet the witnesses against him face to face ; and, in prosecutions on presentment or indictment, to a speedy trial by an impartial jury of the vicinage ; that the accused can not be compelled to give evidence against himself, nor be deprived of life, liberty or property, but by the judgment of his peers or the law of the land."

Now they did not rest satisfied by using the words " *per legale judicium parium suorum*" of the English magna charta, which Lord Coke says requires the evidence in criminal prosecutions to be given in presence of the prisoner, but they use the expression, the accused, in all criminal prosecutions, has the right to meet the witnesses against him face to face, and that he shall not be deprived of life, liberty, or property, *nisi per judicium parium suorum, vel per legcm terræ*—but by the judgment of his peers or the law of the land. They did not content themselves with the expression which Lord Coke says requires the evidence to be given in the presence and hear-.

ing of the accused ; but they use the emphatic language, " to meet the witnesses against him face to face ;" and also the expression from magna charta, "*per legale judicium parium suorum, vel per legem terræ.*"

The double use of this right is not to be considered acciden-tal or unmeaning. There was a prudential and protecting care in the constitution. They had seen how the subjects of Great Britain had been denied the benefit of this clause in the admin-istration of the criminal code, notwithstanding Lord Coke's construction of magna charta, and they would leave no ground for such a practice here. In 1696, Sir John Fenwick was indicted for high treason, but because the Crown could not produce against him two witnesses, the parliament passed a bill of attainder of high treason against him, and he was executed. He was indicted for treason upon the testimony of Porter and Goodman, and Goodman afterwards withdrawing himself from the kingdom, the parliament undertook " to do the business for Sir John"—to use the language of a member of the house of commons—and so managed it as in a very short time to bring the prisoner to the scaffold. But, for the honor of the British parliament, Sir John Fenwick was the last Englishman who has thus suffered. The lawyers for the Crown, in this case, heard the testimony of the witness Goodman, under the examination by Mr. Vernon, a member of the house of commons. This examination they proposed to read to the house in support of the bill of attainder—Sir John Fenwick not being present when it was taken, nor privy to the examination. It was most clearly illegal and incompetent evidence according to the rules of evi-dence of the British courts of justice. This evidence was op-posed by the very able and learned counsel of Sir John Fen-wick, Sir Thomas Powys and Sir Bartholmew Shower, lawyers of distinguished eminence. They opposed the reading of this examination of Goodman, as a matter wholly new, not sanc-tioned by the rules of evidence and practice. They asserted that no deposition of a person can be read, though beyond sea, unless in cases where the party it is to be read against was privy

to the examination, and might have cross-examined him, or examined to his credit, if he thought fit ; it was never pretended that depositions could be read upon other circumstances. But in criminal cases it was never admitted ; nay, in an appeal of murder, if depositions be taken before the coroner, and there be an examination of witness upon the indictment, though the appeal be for the same fact, and in order to bring the person to the same punishment, yet in that case those depositions can not be read, because it is another suit ; but it was never attempted in any court of justice that the examination of witnesses behind a man's back could be read in any place whatever. Our law requires persons to appear and give their testimony *viva voce*, and we see that their testimony appears credible or not by their very countenances and the manner of their delivery. They contended that it was but justice in criminal cases, especially under the British constitution, that the person shall see his accuser. A man may swear a deposition reduced to writing, whose conscience, perhaps, would not let him publicly accuse the prisoner face to face. Sir Bartholmew said : " I am speaking for the life of a man, and for maintaining the rules of law, which I hope shall continue forever, and that is that the examination of a person that is absent shall not be read to supply his testimony." This trial of Fenwick has been called " a pretty strange one, where the person that stands upon his trial hath a chance to be hanged, but none to be saved." In the house of lords this bill of attainder was passed by a very meager majority—six ; the minority entering a spirited protest against its passage, which sets forth among other reasons the following : " Because the information of Goodman in writing was received, which is not by law to be admitted ; and the prisoner, for want of his appearing face to face, as is required by law, could not have the advantage of cross-examining him ; and it would be of very dangerous consequence that any person so accused should be condemned ; for, by this means, a witness, who shall be found insufficient to convict a man, shall have more power to hurt him by his absence than he could have if he

were produced *viva voce* against him." (Howell's State Trials, vol. 13, 538.) I have mentioned this trial of Sir John Fenwick, and extracted a few passages from the proceedings, in order to show the importance then given by English statesmen and English lawyers to the right of meeting the witnesses against the accused, in prosecutions for treason, face to face. We are not to suppose that the framers of our constitution were ignorant of the advantages to public prosecutions for criminal offences resulting from the right to have the witnesses and the accused face to face in presence of the court and jury. The countenances and manner of the witnesses were all important, and by these the jury could very correctly estimate the amount of credibility each witness deserved at their hands.

But it has been insisted that the question is *res adjudicata* both in England and in the United States, and whatever might be the proper decision to be made if it were now to be discussed and settled for the first time, it is too late at this day to disturb the uniform course of decision. After a careful examination of the British statutes and decisions on the subject, I am satisfied that none of them have any bearing on the point. There is this plain reason why they should not have : there never was any British statute which embodied either the language or substance of our constitutional provision. I concede it was the practice of the English courts to admit in evidence, in capital cases, the depositions of witnesses taken in the presence of the accused, or in his absence, or mere hearsay testimony, and that whether the witness was living or dead, or amenable to the process of the court or not. But how can it be shown that such practice is authority, or precedent even, for construing the constitution of Missouri, which contains a direct inhibition of every such thing ?

The statutes 1 & 2 Philip & Mary, chap. 13, (6 Pickering's British Stat. at large, p. 57 ;) 2 & 3 Philip & Mary, chap. 10, ib. 74, contain not one single word which could make any ruling in reference to them pertinent to the point before this court. The statute of 5 & 6 Edward VI, chap. 11, § 12, (5 Picker-

28—VOL. XXIV.

ing's British Stat. at large, p. 374,) requires two lawful accusers to the treason and offences therein mentioned, which said accusers at the time of the arraignment of the party accused, " if they be then living, shall be brought in person before the party accused, and avow and maintain that that they have to say against said party to prove him guilty of the treason or offences contained in the bill of indictment laid against said party arraigned, unless the said party shall willingly, without violence, confess the same." This is the same statute which Sir Michael Foster says was so flagrantly disregarded by the judges. It must be borne in mind that this only requires the witness to appear in court on the trial, " if living." But if the British statute was confessedly disregarded in the Crown cases because it was not so convenient a thing to procure convictions under it, I am unable to see how that shall furnish us a reason for disregarding our constitution, which we are bound to observe and regard, whether convenient or not. For this reason I lay out of view the English decisions which have been quoted at the bar. The American authorities referred to as determining that the words in " all criminal prosecutions the accused has the right to meet the witnesses against him face to face," do not entitle the accused to the presence of the witness in court, are the following : Rex v. Barber, 1775, 1 Root, 76 ; State v. Webb, in 1794, 1 Haywood, 104 ; State v. Moody, 1798, 2 Haywood, 31 ; United States v. Wood, 1818, 3 Wash. C. C. 440 ; Commonwealth v. Richards, 1836, 18 Pickering, 437 ; Johnson v. State, 1821, 2 Yerger, 38 ; State v. Campbell, 1844, 1 Richardson, 124 ; State v. Hooker, 1845, 17 Verm. 669 ; Thorp v. State, 1849, 15 Ala. 749 ; Davis v. State, 1850, 17 Ala. 356 : 15 Wend. 421 ; 8 Wend. 598 ; 3 Hill, 294 ; 5 Hill, 32 ; 2 Arkan. 249 ; 13 Ark. 676 ; 3 Hump. 344 ; 10 Hump. 488 ; 2 How. (Miss.) 665 ; 5 How., (Miss. 14 ; 1 Meigs, 265 ; Campbell v. State, in 1852, 11 Georgia, 353. Such an array of authorities, if pertinent to the matter and binding on this court, ought to be sufficient. But it will be seen that of this number more than one-third of the adju-

dications relied on by the State, as fixing the meaning of the provision of our constitution, are decisions made expressly upon the authority of the English courts, not in the exposition of the constitutional question here involved; and in fact by courts in states where there is no such constitutional provision as we have in Missouri. Such are the cases from 1 Root, 76; 1 Richardson, 124; 2 Hill, S. C., 608; 8 Wend. 598; 15 Wend. 421; 3 Hill, N. Y. 294; 5 Hill, 32, and 11 Georgia, 353. The two cases from Haywood, (1 Hayw. 120, top page, 104 side page; 2 Hayw. 31,) were made under the constitution of North Carolina, which does not give the accused the right to meet the witnesses against him face to face, but only " to confront the accusers and witnesses with other testimony." The case from 3 Wash. C. C. R. is from a *nisi prius* court; the question, now before us, was not raised in it, and no authority is cited. Of the remaining citations, there are only seven in which the right of the prosecution to prove on the trial what has been previously testified to by a deceased witness was under consideration. These are 18 Pickering, 437; 17 Verm. 669; 2 Yerger, 58; 15 Ala. 749; 17 Ala. 356; 3 Hump. 344, and 10 Hump. 488.

I will examine these cases. The constitution of Massachusetts is not like ours. It provides "that no subject shall be held to answer for any crimes or offences until the same is fully, plainly, and substantially and formally described to him, or be compelled to accuse or furnish evidence against himself; and every subject shall have the right to produce all proofs that may be favorable to him, to meet the witnesses against him face to face, and to be fully heard in his defence by himself or his counsel, at his election." The case in 18 Pick. 437, is not inconsistent with this provision of the constitution of Massachusetts, which only gives the accused in general terms the right to meet the witnesses face to face. The right, it may be, is satisfied by one meeting, under the constitution of Massachusetts. There is in Massachusetts no right in the accused to meet the witnesses against him face to face on every prosecution. This

case may then be considered as no satisfactory authority on the question before us. In prosecutions involving the life of the accused, I should long hesitate before making a decision literally complying with the words of a constitution, and *thereby cutting off* the rights of the accused. A literal construction *securing and extending* the rights of the prisoner is much more consistent with judicial duty as well as more consonant to the dictates of reason and humanity.

In 2 Yerger, 58, a deposition of a deceased witness, taken in the presence of the accused, was allowed to be read against him on his trial. This decision rests on no authority but the decisions of North Carolina, which I have already shown were made under a constitution different from ours. This decision in 2 Yerger has been followed in Tennessee by the cases in 3 Hump. 344, and 10 Hump. 488.

In 17 Vermont, 669, the constitutional question was never raised ; the case was put wholly on the English authorities, without an intimation that any constitutional provision existed.

In 15 Alabama, 749, the constitutional objection was pressed upon the court, but was overruled on the supposition that magna charta contained the same provision as the constitution of Alabama, and has never been construed to require the witnesses in court. But magna charta contains no such provision. Coke's Reps. 315, are referred, and turns out to be a civil case. 1 Richardson, S. C., 124, and 1 Root Conn. Rep. are also cited ; but in these states there is no constitutional provision on the subject. The case then in 15 Alabama rests on an erroneous assumption that magna charta contains expressly a similar declaration of this right as many of our state constitutions do. 17 Alabama is predicated on 15 Alabama, 749.

The great mass of authority therefore melts down into this, that in Vermont there is one decision of the Supreme Court where a deposition of a deceased witness was admitted on English authority, the constitutional point not being raised. In Tennessee similar evidence has been admitted on the authority of a North Carolina case. In Alabama such testimony has

been held admissible on the authority of Tennessee and Vermont.

In Collier v. The State, 13 Ark. 679, the question of admitting the deposition of a deceased witness, taken before the examining court, was expressly left undecided. It has also been held in Tennessee, (1 Overton, 229,) that such evidence could not be received under the constitution of that state. In Fenn v. Commonwealth, 5 Randolph, 708, it was held that such evidence is not admissible in a criminal case.

The other authorities relied on by the attorney for the State, namely, 2 Ark. 249 ; 13 ib. 676 ; 2 How., (Miss.) 14 ; 1 Meigs, 265 ; 11 Georgia, 353, are cases touching the admissibility of dying declarations, and it has been argued, on the part of the State, that dying declarations can not be admitted, if the constitution is held to exclude the deposition of Nievergelder.'

I have no difficulty in relation to the admissibility of dying declarations. I find my views well expressed by Mr. Justice Lumpkin, in case of Campbell v. State of Georgia, 11 Geo. 373. Mr. Justice Lumpkin said : " Holding then as we do that the inviolability of the rule must be preserved, which in all criminal prosecutions entitles the accused to be confronted with the witnesses against him, does it abrogate the common law principle that the declarations *in extremis* of a murdered person as to the homicide are admissible evidence ? The right of a party accused of a crime to meet the witnesses against him face to face is no new principle. It is coeval with the common law. Its recognition in the constitution was intended for the two-fold purpose of giving it prominence and permanence. The argument for the exclusion of the testimony proceeds upon the idea that the deceased is the witness, when in fact it is the individual who swears to the statements of the deceased who is the witness ; and it is as to him that the privileges of an oral and cross-examination are secured. The admission of dying declarations in evidence was never supposed in England to violate the well-established principles of the common law, that the wit-

nesses against the accused should be examined in his presence. The two rules have co-existed there, certainly, since the trial of Ely in 1720, and are considered of equal authority. The constant and uniform practice of all the courts of this country, before and since the revolution, and since the adoption of the federal constitution, and of the respective state constitutions containing a similar provision, has been to receive in evidence, in cases of homicide, declarations properly made in *articulo mortis*. It constitutes one of the exceptions to the rule which rejects hearsay evidence. It is founded in the necessity of the case, and for the reason that the sanction under which these declarations are made in view of impending death and judgment, when the last hope of life is extinct, and when the retributions of eternity are at hand, is of equal solemnity as that of statements made under oath. With the policy of the rule, which has been so ingeniously assailed by counsel, we have nothing to do. I will not deny but that it may be justified by that urgent necessity which is a sufficient ground for dispensing with any rule. Chief Justice Tilghman thought there could be no stronger case of necessity than that which require the declarations of the dying victim of secret assassination to be received in order to the detection and punishment of his murderer. Moreover, he supposed that its allowance, and the knowledge that upon it the culprit might be condemned, would have a saving and protecting influence upon society. Still it must be admitted that great caution should be observed in the use of this kind of evidence, and that, were the point *res integra*, much might be said against the practice."

In Woodside's case, 2 How. (Miss.) 665, it was said by the court that the "bill of rights, in respect to the right of the accused of being confronted by the witness for the prosecution, is but an affirmation of a long cherished principle of the common law. By the bill of rights the accused is secured in the right of an oral examination of the opposing witnesses, and the advantage of a cross-examination. This privilege is placed beyond legislative action. The same rights belong to the sub-

State v. McO'Blenis.

jects of England; but there they have no constitutional provision guarantying its perpetuity. The argument proceeded upon the supposition that the *deceased party* was the witness, and, as he could not be confronted or cross-examined by the prisoner, it was a violation of the rights of the prisoner, secured by the sovereign will of the State, to allow the dying declarations of the deceased to be given in evidence. But it is upon the ground that the murdered individual is not a witness that his declarations, made *in extremis,* can be offered in evidence upon the trial of the accused. If he were or could be a witness, his declarations, upon the clearest principle, would be inadmissible. His declarations are regarded as *facts* or *circumstances* connected with the murder, which, when they are established by oral testimony, the law has declared to be evidence. It is the individual who swears to the statements of the deceased that is the witness, and not the deceased."

In my opinion, this well-established rule admitting the dying declarations of deceased persons to be given in evidence on the trial of the supposed murderer has been the stumbling-block in the way of some respectable courts on such trials ; and, to go around it, they have prostrated the constitutional provision in regard to confronting the witnesses face to face. I am satisfied that the dying declarations may be given in evidence. I am equally satisfied that the witness who details such declarations must do it in court, in the presence of the accused, and that by this rule there is no violation of the prisoner's constitutional rights. We must not forget that this provision in our bill of rights does not make a new rule of evidence ; it does not declare what may be or may not be proper and lawful evidence on the trial of a criminal prosecution ; it relates to the *position of the witness* in lawfully detailing such facts as may be lawfully submitted to the jury in a criminal prosecution. The *status* of the witness is affected. He must be in court. So must the accused. He shall not detail his knowledge of the facts in a dark or secret chamber, in the absence of the accused, to be afterwards read against the accused before the jury. In every

criminal prosecution—" *in all criminal prosecutions*"—could there be language more comprehensive ? Can it be denied that the trial before the Circuit Court — the court of the highest original jurisdiction in such matters — before a petit jury, whose verdict may seal his fate forever—that such is a criminal prosecution ? Will this be denied, and yet the examination before a petty magistrate, with no power to empanel a jury in the case, be called a criminal prosecution—and one too, where, if the accused be privileged to meet the witness, it forever satisfies the constitutional right of meeting the witnesses face to face in all prosecutions ? Who that has ever practiced his profession for five years does not know that in many cases the accused and his counsel never pretend to make his defence, or to show the grounds of it, before the examining court—seldom cross-examine a witness, but wait until they come before the triers and the court with jurisdiction to punish before they open or explain the nature of the defence ? The injured persons are generally the witnesses for the prosecution before the examining court ; they detail the evidence smarting under the injury. Policy then dictates to the accused to do but little in the way of cross-examination. Often one-sided statements are permitted to be made without an effort to correct them. 'Let such examinations be afterwards considered lawful evidence, in case the witness be dead, or be out of the state, or can not be found, and who can tell the amount of injury to follow in the administration of the criminal law ? I am therefore for giving a plain common-sense construction of this section in our declaration of rights. I am compelled to believe that the framers of our constitution so understood it, so designed it to be understood ; and therefore my opinion is that in " all criminal prosecutions" the accused has the right to meet the witnesses against him face to face ; that depositions can not be read against him without his consent, and that the testimony of a deceased witness can not be used against him. The power of cross-examination was not the only right secured, but the right that the prisoner and the jury might both see the countenances and manner of the wit-

nesses, and that the witnesses might feel this vast moral power compelling them to testify the truth, the whole truth, and nothing but the truth.