## EARL HOBBS v. THE STATE.

### No. 3769. Decided Feb. 12, 1908.

**1.—Murder—Severance—Dismissal by State—Practice in District Court.**

Where upon trial for murder it appeared defendant and his two codefendants were separately indicted; that the court had granted defendant's motion for a severance and had ordered that his two codefendants should be first tried; but that afterwards the State was permitted by the court to enter a nolle prosequi as to said codefendants over defendant's objection and defendant was forced to trial; that no immunity was granted said defendants; that the State rested its case without placing said codefendants on the witness stand as demanded by defendant's written motion which was overruled. Held no error. Overruling Puryear v. State, 50 Texas Crim. Rep., 454.

**2.—Same—Secondary Evidence—Inquest Proceedings—Confronting Witnesses.**

Where upon trial for murder, it appeared that the testimony of two State's witnesses had been reduced to writing in due form at an inquest during a regular proceeding before a justice of the peace, and opportunity for cross-examination had been afforded defendant, and said witnesses had since moved beyond the jurisdiction of the State, such testimony was admissible. Following Porch v. State, 51 Texas Crim. Rep., 7. Davidson, Presiding Judge, dissenting.

**3.—Same—Rule of Necessity—Discretion of Court—Practice in District Court.**

After all it must be left to the discretion of the prosecuting officers and of the trial court to say whether in a given case it is deemed necessary or important to have before the trial court the testimony of witnesses, either dead or beyond the jurisdiction of the State; and the mere fact that other witnesses could testify to the same state of things as the absent witnesses, would be immaterial.

**4.—Same—Evidence—Husband and Wife—Cross-Examination—Impeachment.**

Upon trial for murder where the defendant placed his wife upon the witness stand in his own behalf, for the purpose only of proving that on the day preceding the homicide the deceased had used insulting language toward her, and that she communicated the same to the defendant shortly before the homicide, and the State thereupon was permitted on cross-examination to ask her whether she did not tell a State's witness just a few moments before the killing that she had told her husband of the insult by the deceased and that they had gone to look for deceased and she did not know what was going to happen, which statement the witness denied; and there was no testimony that defendant had told his wife that he was going to look for deceased, whereupon the State was permitted to impeach the wife by the said State's witness. Held reversible error. Following Bluman v. State, 33 Texas Crim. Rep., 43, and other cases.

Appeal from the District Court of Hill. Tried below before the Hon. W. C. Wear.

Appeal from a conviction of manslaughter; penalty, four years imprisonment in the penitentiary.

The opinion states the case.

*Collins & Cummings,* for appellant.—On question of severance: Cases cited in opinion. On question of secondary evidence as to inquest testimony: Cases cited in opinion. On question of cross-examination of wife: Cases cited in opinion.

*F. J. McCord,* Assistant Attorney-General, for the State.—On question of cross-examination of wife: Skaggs v. State, 31 Texas Crim. Rep., 563.

RAMSEY, JUDGE.—Appellant was charged by indictment with the murder of one Ed Kelly, alleged to have been committed on the 5th day of September, 1906, in Hill County, Texas. He was convicted of manslaughter, and his punishment assessed at four years confinement in the penitentiary.

The facts in brief show that appellant, at the time of the homicide, was a young man slightly past 21 years of age, living with his young wife, and baby a few months old, some four miles east of Itasca on a farm. The deceased was a man some 35 years or more, and was practically a stranger in the community. About a week before the homicide he had been hired by appellant along with O. Leggett, who was also a stranger, to pick cotton. On the day before the homicide appellant went to Itasca, a town nearby on business, leaving the deceased and Leggett at his home with his wife and child. Shortly after he had left home Leggett left also, leaving deceased and appellant's wife at the house. It is claimed by the wife of appellant that the deceased was guilty of gross indignities in the absence of her husband, going to the extent of seizing her in his arms and importuning her to have carnal intercourse with him. Defendant's wife made no report to him of the matter that night on his return, but in view of his announcement of his purpose to go to Itasca again the next morning she remonstrated with him and begged him not to go and leave her with that man (meaning deceased), and in reply to his demand to know why she was afraid of deceased, she stated to him a portion of the insulting conversation with the deceased leading up to his seizure of her; but did not make a full disclosure, for the reason, as stated by her, that this would cause great trouble and sorrow through which she was now passing. However, in view of what his wife already told him, appellant at once discharged deceased, and told him that if he would go into town he would get the money he owed him and pay him for his services. This deceased declined to do, and it was stated he would not wait for his money and immediately left appellant's house, going in an easterly direction. Appellant went on to Itasca, which was situated in a westerly direction from where he lived, and while there purchased a double-barrelled shot-

gun and some ammunition. While in Itasca he made some inquiry as to what one should do or ought to do to a man who had insulted his wife. Appellant was accompanied home by Watson, his cousin, and Leggett, his employee. When he reached there, as he states, he went to his wife, and told her that he did not believe she had told him all that had occurred the day before; whereupon she broke down, as he says, and through her tears, made a full disclosure of all that had occurred, involving the most reprehensible conduct on the part of the deceased. On receiving this information, appellant went out of the house, mounted a horse that belonged to his cousin Watson, and galloped off in the direction that deceased had gone some hours before, with the purpose, as he declares, of requiring deceased to explain his conduct. He soon found deceased picking cotton in the field of one Morris, and while the testimony is not wholly in agreement, the substantial facts seem to be that, without parley, and probably without warrant, shot the deceased in the field in the cotton row where he was at work. Appellant, however, it should be stated, claims in his testimony that when he came upon deceased, with a view of making inquiry as to his conduct towards his wife, and demanding an explanation of same, that the deceased was looking straight at him and threw his hand behind him, and appellant thought he was going to draw a pistol. Leggett and Watson, the parties with appellant, were each separately indicted as a principal for the murder of deceased. While not intending to comprehend herein every essential fact of the case, the statement above substantially illustrates the situation far enough to make intelligible the issues discussed.

There are three substantial questions raised on the appeal, and which were discussed in oral argument and are clearly presented in the record:

1. It was shown, as stated, that Hence Watson and Oscar Leggett, and the appellant were each separately indicted as principals for the murder of deceased. It was shown that at the January term, 1907, of the District Court of Hill County, and on the thirtieth day of that month appellant filed his motion in writing which was duly sworn to, in which he alleges the pendency of said indictment against Watson and Leggett for the same offense, and that the evidence was insufficient to convict said Watson and Leggett, and that he desired their testimony, and prayed a severance to the end that these defendants be first tried. This motion was granted by the court, and an order entered that Watson be first tried; and that Leggett be next tried, and that both of them should be tried before appellant. It is further shown in the record that on the 8th of April, 1907, when this case was called for trial, that neither Watson nor Leggett had been placed upon trial, nor had their cases been disposed of, but both cases were held pending on the docket. The record further shows that appellant filed an additional motion at that time calling the court's attention to the failure of the State to comply with the order of the court formerly made granting his motion to sever, and in said second motion renewed their former motion for severance, and again prayed the court to have said cases against Watson and

Leggett first tried, and finally disposed of before he should be placed upon trial. Thereupon, the county attorney prepared a formal motion in the Watson and Leggett cases, asking an order of nolle prosequi on the ground that the evidence was insufficient to sustain a conviction against them, and asking that said cases be dismissed. Whereupon, the court entered upon the docket, opposite each of said cases the following order: "April the 8th, nolle pros. by State for reasons on file." The record further shows that appellant, by his counsel, objected and protested to the proceedings so had in dismissing said Watson and Leggett cases, because such proceeding was not in compliance with the order of the court made, nor in accordance with appellant's motion to sever, and that said dismissal was not a trial or final disposition of the cases, and contended that they should have been tried or dismissed with a guaranty of immunity from further prosecution, so that appellant could avail himself of the said Watson and Leggett as witnesses, and that he might have them free and untrammeled by any fear of a future prosecution. In this state of the record appellant was compelled to make an announcement of ready or not ready for trial. The record further shows that the State rested its case without having placed either Watson or Leggett upon the witness stand, at which stage of the proceedings appellant filed a motion, asking the court to require the State to place Watson and Leggett on the witness stand and prove by them the facts and circumstances immediately attending the homicide in order that appellant might have the privilege of a cross-examination of said witnesses. This motion was overruled by the court, and neither Watson nor Leggett was introduced by either party, nor were they witnesses in the case at any stage of the proceedings.

Appellant claims that these proceedings were directly in the face of the holding in the case of Puryear v. State, 50 Texas Crim. Rep., 454; 17 Texas Ct. Rep., 721. To this contention we accede, and if the rule adopted in the Puryear case should prevail we would not hesitate to reverse the case for the error here assigned. We do not believe, however, that the Puryear case should be followed. We think the reasoning in that case is fallacious and unsound, the conclusion reached unsafe, and the result wholly mischievous. It is directly in the teeth of the decision of this court in the case of Brown v. State, 42 Texas Crim. Rep., 176. It is, as we believe, at variance with the letter and spirit of our Code of Criminal Procedure.

Articles 707, 708 and 709 are as follows: "Article 707. When two or more defendants are prosecuted for an offense growing out of the same transaction, by separate indictments, either defendant may file his affidavit in writing that one or more parties are indicted for an offense growing out of the same transaction for which he is indicted, and that the evidence of such party or parties is material for the defense of the affiant, and that the affiant verily believes that there is not sufficient evidence against the party or parties whose evidence is desired to secure his or their conviction, such party or parties for whose evidence said

affidavit is made shall first be tried; and in the event that two or more defendants make such affidavit and cannot agree as to their order of trial, then the presiding judge shall direct the order in which the defendants shall be tried; provided, that the making of such affidavit does, not, without other sufficient cause, operate as a continuance to either party.

"Article 708. When a severance is claimed the defendants may agree upon the order in which they are to be tried, but in case of their failure to agree the court shall direct the order of the trial.

"Article 709. The attorney representing the State may at any time, under the rules provided in article 37 dismiss a prosecution as to one or more defendants jointly indicted with others, and the person so discharged may be introduced as a witness by either party."

It will thus be noted that provision is made that where two or more defendants make such affidavit and cannot agree as to the order of trial, then the presiding judge shall direct the order in which the defendants should be tried. It will also be noted that provision is made that the making of such affidavit shall not, without other sufficient cause, operate as a continuance to either party. It is expressly provided (see article 708) that when a severance is claimed the defendants may agree upon the order in which they are to be tried, but in case of their failure to agree, the court shall direct the order of trial. Article 709 provides, that the attorney representing the State may at any time, under the rules provided in article 37, dismiss a prosecution as to one or more defendants jointly indicted with others, and the persons so discharged may be introduced as witnesses by either party. Now, in this case neither of the parties, Watson nor Leggett, were in fact introduced by the appellant. While it might be presumed that they would have testified to facts helpful to him, this is but a presumption. It is possible that if placed upon the witness stand that they might have refused to testify on the ground that their testimony would tend to criminate themselves, but whether they would have done so or not is at most an idle speculation and a chance surmise. To hold that the very fact that a severance was claimed and granted, and that after the prosecution was dismissed against these witnesses, that without offering them, without any effort being made to obtain their testimony by placing them on the witness stand, that appellant is entitled to a reversal for the sole and only reason that the cases had not in fact been tried or immunity granted, is going farther than we are willing to go. If there was any suggestion in the record that the dismissal of the cases was not in good faith, as appears in some of the cases, a different question would be presented, but to uphold in this case appellant's contention on this point is to give him a greater right in respect to the Watson and Leggett cases than either of those defendants themselves had. When their cases were reached, under the law, it lay within the discretion of the county attorney to determine whether he would prosecute the cases or enter a nolle prosequi and such defendant, if he so concluded, would have no just cause for complaint. Shall we give this appellant a greater

right in respect to Leggett's case than Leggett had? If the case against Watson be, over his protest, dismissed, shall we say what might be lawfully done over Watson's protest, will be unavailing when another party, appellant in this case, objects? Again, such a holding is opposed to and would stand in the way of a due and proper administration of justice. It can well be understood in this case, even if the county attorney had the most convincing evidence of Watson and Leggett's guilt, that at the time when the cases were called, some witness might be missing whose testimony would be indispensable to their conviction and to the due administration of justice. He might decide for some reason at the moment to dismiss the case. Shall it be said that the hand of the law or chief officers of the State shall be rendered powerless because some other litigant may have a remote interest in the proceeding; that such litigant shall have the direct control and be the presiding genius over the fortunes of the State's prosecutions. How would it work in this case? Neither Watson nor Leggett had been offered as witnesses in the case. We might assume that their testimony is important. Upon another trial it may or may not in fact be offered. Suppose we reverse this case. Let us assume the most charitable view that Watson and Leggett are both innocent. It results that we send this case back to the District Court of Hill County with a message to the judge of that court that he is to go bravely through with the reassembling of the grand jury that they may indict innocent men, for the purpose of having a formal order of acquittal entered to the end that appellant may have the option, which so far he has not chosen to exercise, to offer these codefendants as witnesses on the trial of his case. As we say, we think that the Puryear case is not supported by the intent and true meaning of our statutes. It is against the early decisions of the court. It is illogical in its reasoning and it is evil, and only evil in its results. So believing, we overrule the Puryear case, and uphold and commend the action of the trial court in the matter complained of.

2. It is shown by proper bill of exceptions that shortly after the homicide in this case, an inquest proceeding was held before a justice of the peace, and that on this hearing John T. Morris and Wiley Clair testified, and that their testimony was reduced to writing, sworn to and signed by them. At this hearing appellant and his counsel were personally present, and cross-examined these witnesses. Without setting out their testimony, it may suffice to say that it was material and adverse to appellant. On the trial it was shown that Wiley Clair was in the State of Oklahoma. It was also shown that the witness Morris was in the State of Oklahoma. The State introduced in evidence, over appellant's objection, preserved by proper bill, the written testimony of both these witnesses, Clair and Morris, taken at the inquest. The point here made is, that this testimony was not admissible in any event, for the reason, as contended, that under the Constitution appellant had the right to be confronted on this trial by these witnesses, and that under the peculiar facts of this case, the rule maintained in the Porch case, 51 Texas

Crim. Rep., 7; 18 Texas Ct. Rep., 761, and other cases ought not to apply, for the reason that, under the peculiar facts of this case, the ground of necessity upon which this testimony is sometimes admitted, does not apply. We do not feel ourselves required to go into this question at length. It can no longer, we think, in this State be an open question that where the testimony of a witness has been reduced to writing, in a regular proceeding, where opportunity for cross-examination had been afforded defendant, and a witness has died or moved beyond the jurisdiction of the State, that on a final trial of the case, this testimony will be admitted. Such testimony was admitted by our Supreme Court many years before the creation of this tribunal in the case of Greenwood v. State, 35 Texas, 587, in 1871. This position has been maintained and upheld by this court, beginning with the case of Black v. State, 1 Texas Crim. App., 368, in an unbroken line of decisions for more than a quarter of a century, and was never seriously questioned until the rendition of the opinion in the Cline case, 36 Texas Crim. Rep., 320. While the majority opinion in that case is a magnificent piece of legal reasoning, and shows great research, it is so opposed, not only to the decisions of this court, but practically every court of last resort on the American continent, that we do not believe the temporary departure thus made from the settled rule of construction everywhere among the English speaking people should be an authority seriously regarded. In passing, it may be stated that the ruling in the Greenwood case, the Black case, and in the Porch case, is in accordance with what has been the rule in England since 1654. This, too, is the rule in the Supreme Court of the United States, where the question has often been considered. See Mattox v. State, 156 U. S., 237, and West v. Louisiana, 194 U. S., 258, and under statutes similar to our own has been uniformly so held without a single dissent so far as an examination of the authorities go in any court of last resort in America. So that, without further discussion, we are constrained by the overwhelming weight of authority to hold this contention adverse to appellant.

Nor do we believe that the point made by appellant's counsel and presented with great earnestness and much ingenuity, that a departure from the general rule ought to be made on the ground that, as applied to the facts of this case, the reason for the rule fails. Their contention is, that other witnesses, including P. J. Morris and George Clair were present, and saw, heard and testified to every fact which was testified to and included in the evidence of the absent witnesses, John T. Morris and Wiley Clair, and that, therefore, the testimony could not have been admitted from any supposed reason of necessity as is sometimes said in the decisions. The argument of necessity which is sometimes said to be a basis and ground for the admission of this character of testimony is but another way of saying that such testimony shall be permitted to be introduced on the ground that its exclusion might and would sometimes defeat the ends of justice. We do not feel ourselves at liberty to say just when this reason of necessity ceases. In a controverted case like

the one at bar, the mere fact that some one or two witnesses testified to the same state of things as is testified to by the absent witnesses, would, we think, make little or no difference. After all, it must be left to the discretion of the prosecuting officer and of the trial court to say whether in a given case it is deemed necessary or important to have before the trial court the testimony of these absent witnesses. Nor do we think it essential to the admissibility of this testimony that it should be put upon the ground of necessity alone. The assignment is overruled, and the action of the court complained of is sustained.

3. Another important question arises upon the examination of Mrs. Lula Hobbs, the wife of appellant. To the end that this may be fairly presented, we adopt, for the purpose of a discussion, the statement of appellant's contention as found in appellant's brief. They say: "Bill of exceptions number 6, recites that the appellant placed his wife, Lula Hobbs, upon the witness stand in his own behalf, for the purpose only of proving that on the day preceding the homicide the deceased used insulting language, and was guilty of improper conduct toward her, and that on the day of the homicide she communicated these facts to the appellant. No other fact or circumstance was elicited or sought to be elicited from said witness by the appellant. The State on cross-examination proved by appellant's wife that a few moments after the occurrence between the deceased and the said Lula Hobbs, Mrs. George Clair came to the house of appellant, and also that the witness Lula Hobbs went to the house of Mrs. George Clair on the day of the homicide, just a short time before the homicide occurred. Counsel for the State also asked appellant's wife if she did not state to Mrs. Clair in a conversation that just before Mrs. Clair came to her house on the day before, that deceased tried to get smart with her and put his hand on the arm of her chair, and she then got up out of the chair and deceased said, 'Good lady, I mean no harm,' and the said Lula Hobbs denied making such statement. Counsel for the State also asked the wife of appellant if she did not say to Mrs. Clair at the latter's house, just a few moments before the killing that the deceased had tried to get smart with her on the preceding day and that she had told her husband, and that they had gone to look for Kelly and that she, the said Lula Hobbs, did not know what was going to happen; and said witness denied making that statement. No objection was made by appellant's counsel to any of these inquiries made of his wife, concerning matters that the appellant had not examined her about; and we rely upon the authority of Brock v. State, 44 Texas Crim. Rep., 335; 71 S. W. Rep., 20, to sustain the proposition that this examination was improper, and constitutes reversible error without a bill of exceptions having been reserved at the time. The bill of exceptions now under discussion shows that, after the appellant's wife had denied making these several statements, the State placed the witness, Mrs. George Clair, on the witness stand and proved by her that Mrs. Hobbs did make each of the statements inquired about. The appellant objected to said testimony of Mrs. Clair, because, first, it was an

effort to impeach the wife of appellant upon an issue immaterial; second, because the said Lula Hobbs was the wife of appellant and in her direct examination no inquiry was made concerning any visits or conversations between her and Mrs. Clair, and it was in effect making the wife a witness against her husband; and, third, that any statements made by Lula Hobbs in the absence of the defendant, to the effect that her husband had then gone to look for deceased, and that if he found him she did not know what would happen, was hearsay, inadmissible and highly prejudicial to the defendant. All of these objections were overruled and said testimony permitted to go before the jury. Following the authority of the cases of Brock v. State, supra, and Moore v. State, 44 Texas Crim. Rep., 526; 75 S. W. Rep., 497, we believe the testimony was not admissible under the doctrine that the wife will not be permitted to testify against her husband." We do not believe that this contention should be upheld, nor that the authority of the Brock case can be invoked successfully. In the Brock case, the wife of the defendant there being tried, was introduced and used as a witness by the State, and the contention was made that under our statute the wife is not a competent witness against the husband in a criminal proceeding of this character with or without his consent; that neither spouse can consent to the other testifying against him in a criminal case except where it is an offense of one aginst the other. Article 774, of the Code of Criminal Procedure, provides: "Neither husband nor wife shall in any case testify as to communications made by one to the other while married; nor shall they, after the marriage relation ceases, be made witnesses as to any such communication made while the marriage relation subsisted, except in a case where one or the other is prosecuted for an offense, and a declaration or communication made by the wife to the husband, or by the husband to the wife, goes to extenuate or justify an offense for which either is on trial." Article 775, Code of Criminal Procedure, provides: "The husband and wife may in all criminal actions be witnesses for each other, but they shall in no case testify against each other, except in a criminal prosecution for an offense committed by one against the other." This disqualification of giving adverse testimony against each other rests upon sound grounds and proper policy, and should be upheld with a strong hand, and we can well understand how the court would deprecate and condemn the use of the wife against the husband, or the husband against the wife as was attempted in the Brock case, whether at the time the person being tried objected or did not object, but the case we have here is, as we conceive, very different. Here the wife was offered as a witness in behalf of her husband; her testimony was vital and important, and if true, as the jury seemed from their verdict, to have believed, evidenced such a gross insult and outrage as to reduce to the grade of manslaughter what otherwise might have seemed an unprovoked and cold-blooded murder. She testified in substance and effect that while unprotected in her household, with only the little babe present, the deceased grabbed her, embraced her, and made the direct prop-

osition that she submit her person to his lustful embraces. The accuracy of this statement the State sought to challenge, and to disprove by the fact that her conduct and conversation with the witness, Mrs. Clair, was wholly at variance with the serious condition of affairs which she claimed she had told her husband. The State could not, in the first instance, have offered appellant's wife against him. He was free, however, to introduce her as a witness in his own behalf, and to seek to obtain the utmost possible benefit from her testimony. She could not be made to enlist against her husband, but when she entered the field for him, she is subject to such cross-examination as will fairly test the truthfulness of her testimony. She becomes, as any other witness, in respect at least to the examination that fairly and legitimately tends to test the credibility and accuracy of the testimony which she gives, the subject of cross-examination. This was the limit to which the cross-examination went in this case, and it was restricted within these legitimate bounds. Having offered his wife as a witness in his own behalf, he is to be held to have consented that her credibility might be tested by such reasonable cross-examination as would disclose the truthfulness or inaccuracy of any statement which she makes. Messer v. State, 43 Texas Crim. Rep., 97. The only matter about which we have any doubt is a feature of her testimony, which is not so much discussed in the brief by counsel for defendant; and in her statement to the witness, Mrs. Clair, in effect said that her husband had gone to look for the deceased, and she did not know what would happen. A somewhat similar question arose in the case of Skaggs v. State, 31 Texas Crim. Rep., 563. In that case the wife of the accused stated in her testimony that she knew her husband was going to kill the deceased. This statement was held to be opinion evidence only, and incompetent for any other purpose, but the error having been cured by the court's withdrawal of the statement from the consideration of the jury, no special attention seems to have been paid to it. In this case reference is had to the case of Drake v. State, 29 Texas Crim. App., 265. In that case while the witness Drake, Jr., was on the witness stand, it was sought to impeach him by inquiring, in substance, that if he did not state to persons named that he knew that his father, the defendant, was going to kill Guinn (the deceased), before he (the witness) left home that morning. This was held not to be a fact or knowledge of a fact, or a material fact about which the witness could be impeached, but was a mere opinion and conclusion, and introduction of the evidence as impeaching testimony was held improper. Here, however, the only extent to which the wife's testimony goes, as shown by the bill, which is much stronger than appears in the statement of facts, is that her husband had gone to look for the deceased, and that she did not know what was going to happen. In other words, it is a mere statement to the witness, Mrs. Clair, having in view her disclosure to her husband, that he was then away from home and that she did not know what the result of the conference would be. If, as the defendant himself testified, his mission was to see the deceased to

demand an explanation, this testimony might relate to the result of the explanation so given. In any event, as presented in the record, it is not clear that the testimony was not admissible, and if it should be held that it was not admissible as a mere expression of opinion, it does not on its face or by necessary implication disclose the statement of opinion as to what the appellant meant to do, and is therefore, we believe not material or hurtful even if it be conceded that it should not have been admitted.

We have carefully gone over the entire record. It bears incontestable evidence on every page that the rights of defendant have been well cared for. Whatever our own views or sympathies may be, it is our belief that the appellant has had a fair and impartial trial. The evidence affirms beyond doubt that he took the life of the deceased, and giving him the benefit of the great provocation testified to by his wife, the jury have imposed the lowest penalty, which, under all the facts, they were reasonably justified in doing.

Finding no error in the record, the judgment of the court below is affirmed.

Davidson, Presiding Judge dissents, and will file reasons.

*Affirmed.*

ON REHEARING.

June 6, 1908.

RAMSEY, JUDGE.—The judgment of conviction in this case was affirmed at the late Dallas Term, and now comes before us on motion for rehearing filed by appellant on the 27th day of February, 1908, and since then taken under advisement.

There is one statement in the opinion in respect to a matter not mentioned in the motion for rehearing which is not strictly accurate. It is there stated: " This too, is the rule in the Supreme Court of the United States, where the question has often been considered. See Mattox v. U. S. 237 and West v. Louisiana, 194 U. S., 258, and under the statutes similar to our own has been uniformly so held without a single dissent so far as an examination of the authorities go in any court of last resort in America." This is a correct statement of the rule where the testimony of deceased persons has been sought to be reproduced. The rule is not, however, so unanimous in cases where testimony has been sought to be reproduced where the witness was shown to be beyond the jurisdiction of the court. In the event of the absence only, there is a sharp division in the authorities as to the admissibility of such testimony. We do not think, however, that whether the witness is dead or beyond the jurisdiction of the court is a matter of controlling importance.

The only matter which we desire to discuss is the third ground of appellant's motion. It is as follows: "The court erred in its opinion in holding that the testimony of the witness Mrs. George Clair to the effect that on the day of the homicide the wife of appellant came

to her house a short time before the homicide occurred, and after the appellant and Hence Watson and Oscar Leggett had left in search of the deceased and told the said witness, Mrs. Clair, that the appellant and Watson and Leggett had gone to look for deceased and if appellant found him she, the said Lula Hobbs, did not know what would happen because said testimony was clearly hearsay and a statement made in the absence of the defendant, if made at all, and was in effect compelling the wife to testify against the husband and was an impeachment of the wife upon an immaterial issue because the appellant had placed her upon the stand to prove only that the deceased had insulted her and that she had communicated the insult to her husband and no inquiry had been made of her by the appellant with reference to any statement she may have made to Mrs. Clair. The said holding was further erroneous because it involved an opinion of Mrs. Hobbs that something serious would happen if her husband should find the deceased and said statement, if made by Mrs. Hobbs, was not a statement of any fact but if the jury believed that she made said statement would only tend to convey the idea to the jury that Mrs. Hobbs was apprehensive of the result of a meeting between the appellant and the deceased; whereas, the only thing that could have been properly proved by Mrs. Hobbs or Mrs. Clair would be some statement that the defendant may have made which would have caused such apprehension upon the part of his wife." In the opinion rendered in the case it was stated: "The only matter about which we have had any doubt is the feature of her testimony (meaning Mrs. Hobbs) which is not so much discussed in the brief by counsel for appellant, and that is, her statement to the witness Mrs. Clair, in effect that her husband had gone to look for deceased and she did not know what would happen." We have concluded on fuller reflection and in the light of the authorities which have been presented and discussed in the motion for rehearing that we were in error in the original opinion wherein we said: "In any event, as presented in the record, it is not clear that the testimony was not admissible, and if it should be held that it was not admissible as a mere expression of opinion, it does not on its face, or by necessary implication disclose the statement of opinion as to what the appellant meant to do, and is, therefore, we believe, not material or hurtful, even if it be conceded that it should not have been admitted." It is also suggested in the opinion that if as defendant himself testified, his mission was to see the deceased to demand an explanation, this testimony might relate to the result of the explanation so given. A closer inspection of the record, however, makes it certain that we overlooked the important fact that there is no testimony showing that the appellant ever stated to his wife that he meant to seek or was seeking the deceased for the purpose of having such conference. It is sometimes difficult to tell in respect to inadmissible testimony what may or may not be injurious and hurtful. If when such testimony is admitted, considering it in one light it would be prejudicial and considering it in another it would be harmless, it

would seem that the law which is ever jealous of the rights and liberties of her citizens, would scarcely justify or permit the admission of such testimony when it might be used improperly to the prejudice of the defendant. The case of Bluman v. State, 33 Texas Crim. Rep., 43, is very much like the case at bar. In that case the appellant had been indicted for arson. He had sought to show as a reason why he did not burn his store that he had placed therein the belongings of his wife, containing her wedding trousseau and solid silver presents, a few weeks before the fire and that all of these were burned. He made proof of this fact by his wife. On cross-examination she was asked the following question: "Did you not, at the hotel, on the night of the fire, after the fire had broken out, state that you had a presentiment that something is going to happen?" (Here the language is, "my husband has gone to seek deceased and I don't know what is going to happen"). Objection was made to this question and the answer sought to be adduced thereby, because the witness was appellant's wife and she had not been asked about these matters on direct examination. The objection being overruled, Mrs. Bluman answered, "I did so state." In passing on the matter the court say: "The cross-examination must be confined to the matter elicited by the direct examination. This is the settled rule. The State could have examined Mrs. Bluman fully as to the trunks, their contents, when they were placed in the store, etc., and if she had made other statements regarding these things this could have been shown. What relation or pertinency a presentiment which she may have had, bear to the testimony about the trunks, their contents, etc., we fail to perceive.

"The Attorney-General contends that this matter was also without injury. It was not germane to the testimony in chief, nor did it tend to contradict her evidence in any legitimate manner. It was therefore the State's evidence. She was made a State's witness, and her evidence was a part of the State's case just as if the State had introduced her, and proved by her that she had had a presentiment that something was going to happen, and that when the fire broke out she stated the fact that she had had such a presentiment. Can it be contended that the State had the right to prove these facts by the wife of defendant? Certainly not. For what purpose could, and perhaps did, the jury use this presentiment of the wife? The witness was the wife of defendant—a relation than which none can be closer or more confidential. While the house was burning she speaks of this presentiment. The jury interprets and applies it to the burning of the house. Was it in fact a presentiment, or had she been informed by her husband that the store was to burn? All people do not believe that there is such a thing as a presentiment. Those who do may not have believed this to have been such, because now closely connected with the burning of the store. For what purpose could the jury have used this matter? Evidently to prove that appellant had determined to burn, or have burned, his store and had directly or indirectly informed his wife of his intentions. The State certainly desired to use it for this purpose. There was no other possible

use to which it could be applied.    But it may be urged that Mrs. Bluman gave such an explanation of her presentiment as to eliminate from it all that which was pernicious.    This proposition is correct, and should solve the question, injury vel non, against the appellant, but for one stubborn fact which can never be settled by this record—did the jury believe her explanation?    We know not, nor does any other person know, save the jurors who tried the case."    In the case of Hoover v. State, 35 Texas Crim. Rep., 342, following the Bluman case, the court says: "On cross-examination of a wife, who has testified as a witness for her husband, she can be interrogated only as to such matters as naturally spring out of, and appertain to, her examination in chief; and it is error to permit her to be cross-examined as to original matters, which may be used against or are prejudicial to her husband."    In that case the defendant was charged with murder.    There was a plea of insanity, the wife was introduced as a witness in his behalf.    On direct examination she testified as to her husband's acts and conduct the night before the killing and as to his uneasiness and apprehensions of danger for about four weeks before the killing.    On cross-examination the State, over the objection of defendant, proved by her that she knew defendant had shot one of the Sparks boys and that he and the Sparks had never made friends.    In discussing the testimony adduced on cross-examination, the court say:    "She (the wife) was introduced by appellant in his behalf, and testified as to his mental condition, and that he was in a state of apprehension or alarm for some time prior to the homicide. On cross-examination, over the objection of appellant, the State was permitted to prove that some years before this, appellant, her husband, had shot one of the Sparks boys, and that just previous thereto, he was in a similar condition of mind.    We heretofore held that this evidence was germane to her testimony in chief, but on a more careful and thorough examination of the question, in the light of the authorities, we are of the opinion that we were in error.    The rule is well established that the wife can be introduced on behalf of her husband, and that on cross-examination she can be interrogated only as to such matters as naturally spring out of and appertain to her examination in chief.    This testimony did not spring out of, and was not germane to, the examination in chief. It was original evidence, and of a most damaging and material character.    In fact it was producing in evidence before the jury against appellant, testimony of another and distinct crime than that for which he was then on trial.    It was calculated to inflame the mind of the jury against appellant, and to prejudice his rights as to the case then on trial.    We adhere to the rule heretofore laid down by this court in the case of Bluman v. State, 33 Texas Crim. Rep., 43."    See also Jones v. State, 38 Texas Crim. Rep., 87; and Richards v. State, decided at the present term; Gaines v. State, 38 Texas Crim. Rep., 202.    We think it fairly certain that the statement attributed to Mrs. Hobbs that her husband had gone to seek deceased and that she did not know what was going to happen, tended strongly to establish and

convince the jury of apprehension on her part that something serious was to happen and was within itself, well calculated to impress the jury or justify the inference by them that appellant had made some statement to his wife showing preparation on his part to assault the deceased, or at least, that this inference was a reasonable deduction from the testimony.

Having carefully examined the authorities cited and others, we do not believe that we would be justified in permitting this judgment of affirmance to stand unless we were prepared to overrule the decisions of this tribunal in the Bluman case, in the Hoover case, in the Jones case, and in the Gaines case, cited above, nor are we, on reflection, prepared to say that the decision in the Bluman case, so strikingly like the one under consideration, is in itself, wrong. On the contrary, fuller consideration and more careful thought has led us to the conclusion that the Bluman case was rightly decided and that the court below should not have admitted the testimony of Mrs. Clair, herein complained of. For the error in so doing, it is ordered that appellant's motion for rehearing be granted and the judgment of conviction be set aside and the case be reversed and the cause remanded.

*Reversed and remanded.*

BROOKS, JUDGE, absent.

DAVIDSON, PRESIDING JUDGE.—I concur in reversing the judgment on ground stated. I think the reproduction of testimony of the absent witness reversible error.

DAVIDSON, PRESIDING JUDGE (dissenting).—Upon motion for rehearing the affirmance was set aside and a reversal had in regard to cross-examination of appellant's wife. To this I agree, but I wish, however, to express my dissent from that portion of the opinion in which it is asserted it is not error to reproduce the testimony of the absent witness. The evidence reproduced was taken before the examining court, the witness being shown absent from the State at the time of the final trial. In Cline v. State, 36 Texas. Crim. Rep., 320, the writer discussed the question at considerable length with reference to reproducing the testimony of a deceased witness, holding it could not be done under that clause of the Constitution which guarantees the right to the accused to be confronted with the witnesses against him. My brethren have overruled the Cline case, stating practically that it is a universal rule to reproduce the testimony of a deceased witness. At page 312, Ency. of Evidence, it is stated that the tendency of the early decisions was greatly to limit or wholly to deny the admissibility on the final trial of evidence of a witness who could not be produced at the trial when his evidence had been given at a preliminary examination of the accused. Citing among other cases in support that of Finn v. Com. 5 Rand. Va., 701. In that case, among other things, it was

said: "In civil cases if a witness who had been examined in a former trial between the same parties and on the same issue, is since dead, what he swore on the former trial may be given in evidence, for the evidence was given on oath, and the party had an opportunity of cross-examining him. Peake 60 Phill., 199. But we cannot find that the rule has ever been allowed in a criminal case. Indeed, it is said to be expressly otherwise. Nor can we find that the rule in civil cases extends to the admission of evidence formerly given by a witness who has removed beyond the jurisdiction of the country. Much less can it be admitted in a criminal case." Also see Brogy v. Com. 10 Gratt 722; Montgomery v. Com. 37 S. E. Rep., 841. These are Virginia cases. In People v. Newman, 5 Hill N. Y., 295, the court said: "It seems to be well settled in this court that nothing short of the witnesses' death can be received to let in his testimony given on a former trial, but if the rules were otherwise in respect to civil cases we are of the opinion that it should not be applied to criminal proceedings." It was also the rule in Tennessee until changed in the opinion in Kendrick 10 Hump., 479, rendered in 1850, which overruled State v. Adkins, 1 Overt. 229. It seems to have been as well the rule in Missouri until the decision of McO'Blenis, 24 Mo., 402. This decision was rendered in 1857. The case of Montgomery v. Com. 37 S. E. 841 was rendered in February, 1901. It is unquestionably true that the earlier rule excluded the reproduction of the testimony of all witnesses, whether dead or alive. Such was the rule practically in the history of the past until the acts of Parliament in England. On a certain occasion the Jews sought to have the Apostle Paul brought to trial. The old Roman judge stated with absolute confidence and without contradiction that it was the custom of the Romans not to try parties until they had been brought face to face with their accusers. The vast assemblage of the accusing Jews entered not a dissent to this statement of the Roman judge. It was too well settled as a law in the Roman Empire to bear contradiction. The Jews as well had been so instructed and taught under the laws of Moses, and from that time down the ages it was the rule and wherever the jurisprudence of the past has touched the Anglo-Saxon civilization it has been the well recognized rule until statute changed the rule in England. Under the common law it may be, I think, safely stated, that it was an impossibility to reproduce such testimony in a criminal case, the reasons for which will be found by an investigation of the history of that great body of law. This was so well recognized in England that it took statutes at intervals covering perhaps two hundred years to abrogate. The first act was passed by Parliament authorizing the reproduction of testimony of dead witnesses. Years afterwards another statute was added permitting the reproduction of evidence of witnesses who had become insane, and then followed still another statute, to wit: where the witness was kept away by the adverse party, and finally the reproduction was admitted when the witness was too sick to ever be able to be present at the final trial, or was permanently beyond the realm. These were statutory innova-

tions, and it took in the neighborhood of two hundred years to engraft these exceptions upon the rule at common law inhibiting the reproduction of testimony. Even under the statute the reproduction of testimony was inhibited in cases of treason. The statute of England, with reference to treason, in this connection, used practically the same language as adopted in our Constitution, and thus compelled the confronting of the accused with the witnesses against him when the party was on trial for that offense. Many expressions occur in the opinions in the United States to the effect that it was the rule at common law to reproduce the testimony of a dead witness, and even some of the opinions have gone far enough to hold that it was a rule at common law to reproduce the testimony taken at an examining trial. Suffice it to say that depositions were unknown to the common law, and it may be further satisfactorily stated that depositions are never taken except under statutory authority. Therefore, this rule could not have existed at common law. In the United States it has been stated that such reproduction was a'rule of evidence at common law, and especially so with reference to the evidence of a deceased witness. An examination of the history of the question will show that such was not the case when speaking of the common law proper. So in these States where this rule has been announced doubtless an inspection, especially the history of the earlier States, will show that the Legislatures of the respective States have adopted many of the acts of Parliament, and in some, all acts of Parliament have been adopted to a certain period. Some of these States adopted all acts of Parliament down to 1688 as common law. The different States vary in fixing the time when the acts of Parliament should become common law, some of them bringing it down even as late as 1776. It can be seen then very readily why the decisions in those States speak of the reproduction of such testimony as under the common law. It will be ascertained, I rather think, if an investigation of the jurisprudence of those States should be made, that the decisions had no reference to common law, properly speaking, but to the statutes adopted as common law. So, there is no question, in the opinion of the writer, that the earlier rule, as far back in history as the Jewish and Roman civilization, was that the accused must be confronted with the witnesses against him. The modern rule, however, has been adopted, and it has been done, as intimated, not by adhering strictly to the truth of the history of the question, but by reason of the statutes mentioned, reinforced by the rule of necessity. It would hardly be contended by any student of our jurisprudence or that of England, from which we have largely borrowed, that prior to the acts of Parliament, it would be asserted that at common law the testimony of the dead or absent witness could be reproduced. In Texas we have not adopted the acts of Parliament, but only the common law as such, properly speaking. So much for the question with reference to the reproduction of evidence generally and of the testimony of the deceased witness specially.

The decisions in regard to the reproduction of the testimony of an

absent living witness is far from being harmonious or unanimous. The contrary rule finds support in a great many authorities, and it is more than difficult to say which is the prevailing rule. Some of the cases which deny the rule are here cited: People v. Newman, 5 Hill N. Y., 295; Finn v. Com., 5 Rand., 701; Brogy v. Com., 10 Gratt., 722; State v. Houser, 26 Mo., 431; Collins v. Com., 12 Bush., 271; Pitman v. State, 92 Ga., 480; United States v. Angell, 11 Fed., 34; Owens v. State, 63 Miss., 450; and Motes v. U. S., 178 U. S., 458, et seq. Some of the cases hold that to receive the evidence of a witness who was merely absent is violative of the constitutional right of the accused to confront the witnesses against him. In the majority opinion the intimation is that when Texas became a Republic and subsequently a part of the Federal Union, our Bill of Rights requiring the accused to be confronted with the witnesses against him was copied or taken from the Constitutions of other States, and, therefore, when adopted, it was with the construction placed upon it in those States. This perhaps is a little difficult of historical confirmation, especially as it is not settled from which State Texas copied her Bill of Rights. Texas became an independent Republic in 1836, and was admitted into the Federal Union in 1845. At the time of our adoption of the Bill of Rights, many of the States, if not a majority of them, had not adopted the later rule of reproducing such evidence, but were operating under the old rule which excluded such reproduction of evidence. As before stated, in Missouri, the rule seems to have been otherwise until 1857, as I understand the McO'Blenis case, supra. So it was in Tennessee until 1850, and it seems that it was not only so in Virginia then but is still the rule as well as perhaps in Georgia as to absent witnesses. And it seems that under the cited cases it is so in Mississippi as to the absent witness. That the jurisprudence of Tennessee and Missouri entered largely into the general make-up of the organic law of Texas may be relied upon with some degree of confidence by reason of the fact that those States furnished some of the great founders and statesmen who carved out Texas Independence, gave her a national existence, and contributed largely to her statesmanship, as well as to her legislation and jurisprudence. The Austins and the Bryans hailed from Missouri, while Crockett and Houston came from Tennessee. However, I do not propose to enter into the history of this question, or of the great men who made our constitutional laws as well as our jurisprudence. I mention these matters to especially call attention to the fact that the rule was more than doubtful even in regard to the deceased witness at the time of the formation of the organic law of the Republic of Texas as well as of the State of Texas. The rule was not known in Texas jurisprudence until after the war between the States that the testimony of a deceased witness could be reproduced. Greenwood v. State, 35 Texas, 587. The intimation in that opinion is that it was necessary to so hold in order that the defendant might have the benefit of reproducing such testimony. Of course, this holding would not be correct inasmuch as the constitutional inhibition only applies to

witnesses against the accused; not to those in his favor. It is, however, correct that the almost unbroken line of authorities in Texas since the Greenwood case sustains the rule authorizing the reproduction of such evidence.

From Montgomery v. Com., supra, I make this quotation: "Referring to the opinion in the Finn case, 5 Rand., 701, he says, after stating that in civil cases where the witness is since dead, what he swore on a former trial may be given in evidence, the judge proceeds, 'But we cannot find that the rule has ever been allowed in a criminal case. Indeed, it is said to be expressly decided otherwise, and all the judges concurred in the opinion that the evidence was inadmissible. This decision has never been controverted in Virginia since. The whole criminal code has since undergone a revision, but the rule as laid down in the Finn case has been acquiesced in by both the court and Legislature. I do not think it necessary, therefore, to go into an inquiry whether the rule was originally founded on proper principles or not. The rule has been established and recognized and I think should be adhered to, and whether a foundation had been laid for its introduction or not, the evidence was properly excluded.'" In Motes v. U. S., supra, the Supreme Court of the United States, through Justice Harlan in regard to absent witnesses, said: "We are of opinion that the admission in evidence of Taylor's statement or deposition taken at the examining trial, was in violation of the constitutional right of the defendants to be confronted with the witnesses against them. It did not appear that Taylor was absent from the trial by the suggestion, procurement or act of the accused. * * * In Reynolds v. U. S., 98 U. S., 145, which was an indictment for bigamy, committed in Utah * * * the trial court admitted proof of what a witness had stated on a former trial of the accused for the same offense but under a different indictment. This court said the Constitution gives an accused the right to a trial at which he should be confronted with the witnesses against him, but if the witness is absent by his own wrongful procurement he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him, but if he voluntarily keeps witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated." In that case reference was made to several authorities, American and English, and the court further said, "The rule has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong, and consequently if there has not been in legal contemplation a wrong committed, the way has not been opened for the introduction of the testimony. * * * In Reg. v. Scaife, 2 Den. C. C., 281, it was held by all the judges that the depositions were not admissible against the defendant who had not caused the absence of the

witness. Lord Campbell, C. J., said, 'I am of opinion that the rule for a new trial must be made absolute; after having been given, the defendant Smith has resorted to a contrivance to keep the witnesses out of the way, the deposition was admissible against him, but it was not admissible against the other defendants, there being no evidence to connect them with the contrivance. The learned Judge Cresswell, J., in summing up the jury seems to have made no distinction as to the duty of the jury to consider the deposition of the absent witness as evidence against the defendant Smith alone and not as against the others. The question then is, whether such deposition is admissible against a prisoner without proof that the witness has been kept away by his contrivance or without proof of the death of the witness. No case has yet gone so far and I should be afraid to lay down a rule which would deprive a prisoner of the advantage of having the witnesses for the prosecution against him examined and cross-examined before the jury upon every matter that may be material to his defense. I, therefore, think that the deposition was improperly admitted against Scaife and Rooke, and that there should be a new trial." This opinion was delivered on May 21, 1900, by the Supreme Court of the United States through Justice Harlan, one of our greatest jurists.

I have seen proper to say this much, realizing that for the present it may be useless, but I am so firmly convinced that neither the courts nor the Legislature nor both combined are at liberty, or entrusted with authority, to either overturn the plain language of the Constitution or engraft upon its plain reading rules of necessity to meet untoward contingencies or inconveniences. If the rule of necessity is to be the criterion by which the Constitution is to be modified or changed either by legislative enactment, decisions of courts or both, then this rule can be at the will of the dispensing or construing power enlarged without limit. I wish to reiterate that there is no power under our form of government invested with authority to change constitutional provisions, except those who ordained the Constitution, and no emergency can become sufficiently urgent to authorize either or all departments of government combined to engraft any rule of necessity upon the plain reading of that instrument, which is in the least a subversion of its provisions.

In closing I desire to incorporate in this opinion the following language found in the 10 Am. Crim. App., at page 249, which is well worthy of careful perusal, thoughtful consideration and perpetuation, and so well accords with the views of the writer that he takes the liberty of reproducing it verbatim:

"In all criminal prosecutions the accused shall enjoy the right * * * to be confronted with the witnesses against him. , What was the aim and object of this declaration found in the sixth amendment of the Federal Constitution, a counterpart of which is embodied in the Bill of Rights, in the Constitution of every State in the Union? Does it mean that if the accused be confronted with the witnesses against him at a preliminary hearing, or coroner's inquest, that the statements given in

evidence on such a rehearing or investigation may be given in evidence at the trial should it appear that the witnesses were dead or had gone beyond the seas? Not at all. Such a holding would virtually eliminate all of the declaration from the Bill of Rights.

"Under such conditions how could the traverse jury discern the demeanor of the witness when on the stand? The paper testimony would not reproduce before the jury, the facial expressions, the halting and changing of voice, the forced self-assertion and abandon, which so markedly reveal the character of the witness when testifying, and constitute almost unerring indications of the truth or falsehood of his testimony. History, reason and the philosophy of the law, verify the force and correctness of the conclusion that the aim and object of this declaration is to secure to the accused the right to be brought face to face with the witness testifying against him, before that jury which is the arbiter of his right to life or liberty.

"Before reviewing some of the historic incidents which the framers of the Constitution most likely had in mind when they penned this declaration of right, let me here solemnly admonish judges, especially of courts of review, to cling closely, with jealous care, to the landmarks of the Constitution, and to hold it their bounden duty to see to it that no person, however humble, shall be denied any right or privilege guaranteed him by that instrument. My own experience and observation, at the bar and on the bench, in the trial of criminal causes, emphasize the truth of the assertion that notwithstanding the intellectual and moral advance of to-day over all the ages which have gone before, the danger of innocent persons being convicted to appease popular sentiments is just as great now as it was when every official held his commission from the king.

"How many times within the memory of us all have innocent men been indicted by a star-chamber grand jury, tried and convicted at the bar of public opinion through the powerful influence of the press, and who would have been sent to the penitentiary, perchance to the gallows, but for the timely interposition of friends or neighbors, through whose aid the victims were enabled to employ counsel to prepare their defense and establish their innocence.

"It is safe to assume that the fathers of the Constitution could not have been unmindful of the teachings of history, touching the star chamber and the inquisition, those tribunals of infamy and terror, before whom men were condemned to death upon the depositions and statements in writing from witnesses unknown to the accused, or by spurious confessions and admissions wrung from the prisoner by torture and terror.

"The inestimable value of the right to the accused of being confronted with one whose testimony is against him is most strongly illustrated in the sacred writings, as well as in the history of criminal jurisprudence. We are told that when Adam broke the Divine command he hid himself from the face of the Lord. After Peter denied the Christ, when the Lord turned and looked upon him he remembered the word of the Lord

and Peter went out and wept bitterly (Luke, chap. 22, par. 61 and 62). Again in Acts of the Apostles, chap. 25, when Paul was a prisoner at Cesarea, King Agrippa visited Festus, the governor, and when the king had been there many days Festus declared Paul's case unto the king. 'There is a certain man left in bonds by Felix, about whom, when I was at Jerusalem, the chief priests and the elders of the Jews informed me, desiring to have judgment against him.    To whom I answered, "It is not the manner of the Romans to deliver any man to die, before that he which is accused have the accusers face to face, and have license to answer for himself concerning the crime laid against him." '

"When affidavits were read to Mary, Queen of Scots, in prison, imputing to her great crimes, the unfortunate queen answered: 'Who are the witnesses (for they were not even named to her) ; bring them before me and they will forswear their falsehoods when they meet me face to face.'

"In 1589 Philip Howard, Earl of Arundel, was tried for high treason, Gerard and Shelby being witnesses against him.    These witnesses accused him of having offered up his prayers for the success of the Spanish expedition against England; Arundel declared that his prayers were only for the preservation of himself and fellow Catholics from the general massacre to which report had said they were doomed in the event of the Spaniards effecting the landing; then fixing his eyes upon Gerard and adjuring him to 'speak nothing but the truth, as he must one day stand before the tribunal of the living God to answer for what he should then say,' he so daunted and disconcerted the witness that he lost his utterance and was unable to repeat his first assertion.

"Sir Walter Raleigh was convicted of high treason, chiefly upon the written statement of one Cobham, which he denied in a letter to Raleigh, but after reaffirmed in part in a letter to the lords, the evening before the trial.    Upon the trial, Sir Walter Raleigh demanded that Cobham should be confronted by him; he appealed to the statute law and to the law of God, which required two witnesses; he even offered to abandon his defense if his accuser would dare to assert, in his presence, that he had ever advised any dealing whatever with the Spanish monarch.    He demanded again that his accuser stand forth, and if Cobham dared to reaffirm a single charge before his face, he would submit in silence to his fate.

"It is unnecessary to multiply cases, for the whole record of each State trial is but the recital of judicial murders, planned by conscienceless and envious officials, and perpetrated through that inhuman system of jurisprudence which permitted affidavits, letters and depositions to be read in evidence against the accused.

"Judges, let me again admonish you to make the Constitution the touchstone of your official action."